THE PEOPLE, *ex rel.* FIEDLER, *v.* MEAD *et al.*

Chapter 375 of 1852, required the raising by tax on the town of Genoa of the interest on certain bonds of that town, the money to be received and paid to the bondholders by commissioners appointed for that purpose. The money having been raised, it seems that mandamus to the commissioners is the proper remedy to enforce payment and not an action against the town.

The act directing the commissioners to issue *bonds* "under their official signatures," is satisfied, it seems, by instruments not under seal, and payable to bearer.

The decision in *Starin* v. *The Town of Genoa* (23 N. Y., 439), reiterated that a certificate, required by the statute, but not made evidence, that the taxpayers had assented to the issue of the bonds, is not proof for a *bona fide* holder of the fact of such assent.

APPEAL from a judgment of the Supreme Court, by which a peremptory mandamus was awarded, requiring the defendants, as the supervisor and railroad commissioners of the town of Genoa, in Cayuga county, to pay to the relator, $560, alleged to be due him from the town of Genoa for interest upon eight obligations of said town for the payment of $1,000 each, held

The People *v.* Mead.

by the relator, which interest fell due on the first day of January and the first day of July, 1856, and for which the relator holds coupons attached to the principal obligations. The obligations purport to have been issued pursuant to an act of the legislature passed in the year 1852, entitled "an act to authorize any town in the county of Cayuga to borrow money for aiding in the construction of a railroad or railroads from Lake Ontario to the New York and Erie or Cayuga and Susquehanna railroad" (ch. 375). They are in the form of corporate or municipal bonds, except that no seal was attached to them; and they are payable to Ashbel Avery, or bearer. The coupons are in the form of due bills, payable to bearer, and there is one for each half year's interest.

The act referred to provides that the assessors of any town in Cayuga county (who were made commissioners for that purpose), in conjunction with the supervisor, may borrow on the faith and credit of the town, a sum not exceeding $25,000, for not more than twenty years and at an interest not greater than seven per cent, " and they are to execute therefor, under their official signatures, a bond or bonds on which the interest shall be made payable annually, or semi-annually, &c. The moneys to be borrowed are to be paid over to the president and directors of such railroad company, organized under the general railroad law, as shall be expressed by the written assent of two-thirds of the resident taxpayers of said town, to be expended in constructing and maintaining a railroad passing through the city of Auburn, and connecting lake Ontario with one of certain other railroads mentioned, "provided always, that the said supervisor and commissioners shall have no power to do any of the acts authorized by this act until a railroad company has been duly organized according to the requirements of the general railroad law for the purpose of constructing the aforesaid described railroad, and the written assent of two-thirds of the resident persons taxed in said town, as appearing on the assessment-roll of such town, made next previous to the time such money may be borrowed shall have been obtained by said supervisor or commissioners, or some one or

more of them, and filed in the clerk's office of Cayuga county, together with the affidavit of such supervisor or commissioners, or any two of them attached to such statement, to the effect that the persons whose written assent are thereto attached and filed as aforesaid, comprise two-thirds of all the resident tax-payers of said town on its assessment-roll next previous thereto." (§ 1.)

The commissioners are authorized to subscribe to the capital stock of the railroad company in behalf of the town to an amount equal to the aggregate of the bonds, and the supervisor is to act in behalf of the town, at meetings of the stockholders. (§§ 2, 3.)

The board of supervisors of the county are to cause to be raised, annually, from the taxable property of any town which shall borrow money under the act, sufficient money to pay the interest on its bonds, as it shall become due. The money so received is to be paid to the supervisor and commissioners of the town, who are to pay the interest on the bonds as it shall fall due. (§ 4.) Provision is also made for eventually raising money to repay the principal to be borrowed.

Duplicate copies of the bonds to be issued by any town are to be filed in the county clerk's office, and the supervisor of each town, which has been a borrower under the act, is to report annually to the board of supervisors, the amount necessary to be raised in his town to pay interest on the bonds. (§ 8.) The remainder of the act is devoted mainly to detailed directions for managing the railroad stock which the borrowing towns were expected to acquire. The town assessors, who, at the outset were to act as commissioners, in connection with the supervisor, are, after the first year, to be replaced by two persons to be chosen expressly as commissioners by the town meeting.

The supervisor and commissioners of Genoa, on the 26th February, 1853, executed twenty-five bonds of the character mentioned, for the payment of one thousand dollars each, the principal payable in twenty years, and the interest semi-annually. They also subscribed for $25,000 of the capital stock

of the Lake Ontario, Auburn and New York railroad company, a corporation formed under the general railroad act, which, in respect to the route of its road, fulfilled the conditions prescribed by the act. Twenty-two of the bonds (which included those afterwards purchased by the relator) were in October, 1853, delivered to the treasurer of the railroad company in payment for so much of the stock, the scrip for which was issued and indorsed as paid in full; but there was an agreement, expressed in the receipt given by the company, that it might return the stock at any time within eight months and cancel the indorsement of it on the scrip, and that within the same time the town might take back the stock upon payment of its par value; and also that if the company should sell it for more than par, the town was to have the benefit of the premium. Neither of these reservations were acted upon by either side. The remaining three of the twenty-five bonds were pledged to a bank to raise money to make the cash payment towards the stock required by the act. There was no other borrowing by means of the bonds, than as above mentioned. The treasurer of the company put certain of the bonds into the hands of a broker in New York to sell, and eight of them were purchased by the relator at eighty per cent of the amount expressed to be payable by them, and five per cent in addition on the whole amount was paid by the company as a commission to the broker, for negotiating them.

One of the subjects litigated was whether the assent of two-thirds of the taxpayers had been obtained, as required by the statute. Three papers of similar tenor, each purporting to express the assent of the subscribers to the borrowing by the town of $25,000 for the purpose mentioned in the act, were produced, with many names purporting to be subscribed to each, to which was annexed an affidavit of the supervisor and assessors of Genoa, by which they deposed that the several persons whose written assent was thereto attached, composed two-thirds of all the resident taxpayers of the town on its assessment-roll made and completed next prior to the date of the affidavit, which was the 11th day of September, 1852.

These papers were filed in the county clerk's office, and there was attached to each of the obligations a clerk's certificate that such written assent and affidavit had been so filed. Evidence was given tending to show that several of the names of persons purporting to be subscribed, as assenting taxpayers, were not on the assessment-roll for the proper year, and that all the subscriptions to the three papers did not number two-thirds of the persons on the roll for that year. It was proved that the board of supervisors of Cayuga county, at their session in the autumn of 1855, had provided for the raising of the money to pay the interest upon the $25,000 of bonds which had been issued by the town of Genoa, though the supervisor from that town made no report of the amount required according to the act, and voted against the resolutions for raising the money. The amount so raised was paid over to the county treasurer. The prior interest on the bonds had been regularly raised and paid according to the act.

The issue was made up by the alternative mandamus, the return of the supervisor and railroad commissioners thereto, and the plea to the return put in by the relator.

The trial took place at the Cayuga circuit before Judge WELLES, sitting without a jury. The facts above mentioned, with some others of less materiality referred to in the opinion, appear from the pleadings and the evidence.

In a paper contained in the Case, called the findings and decision of the judge, the execution and issuing of the bonds were found, and that the town of Genoa had complied with the various requirements of the act as mentioned in the writ, and that the relator purchased the eight bonds held by him "in good faith and for a good and valid consideration paid by him, and became the *bona fide* owner and holder thereof." The raising the interest money and the payment thereof to the county treasurer, who held it subject to the order of the defendants, and was ready to pay it to them, and that they refused to receive it were also stated as facts found by the judge. The questions discussed in the opinion were raised upon the trial in the form of objections to reading the obligations in evidence,

The People *v.* Mead.

and on a motion for a nonsuit, and for judgment for the defendants, the rulings upon which were against the defendants. Judgment was thereupon given for the award of a peremptory writ requiring the defendants to receive from the treasurer $560 of the money in his hands, and to pay it to the relator in satisfaction of the interest mentioned in the coupons aforesaid, and judgment for costs was also given against the defendants. The case came here upon an appeal from the judgment of affirmance rendered by the general term.

*Warren T. Worden,* for the appellants.

*Oliver H. Palmer,* for the respondent.

DENIO, J. The first question to be considered is, whether, upon the assumption that the obligations held by the relator are valid securities under the act of 1852, the proceeding by mandamus is the appropriate remedy for the relator under the circumstances of the case. It is shown that the money to pay the interest has been collected from the taxpayers of the town, by means of the usual official agencies, according to the directions of the act under which the bonds were issued, and that it has been paid to the county treasurer. It then became the duty (supposing the bonds to be legal), of the defendants — the railroad commissioners — to receive this money from the treasurer and pay it to the creditors who held the bonds. But they refused to perform this duty and the mandamus awarded by the Supreme Court was to coerce them to its performance. It is one of the most usual offices of the writ of mandamus to compel executive and ministerial officers to perform official duties appertaining to their offices, where an individual has a private and a pecuniary interest in such performance; and there can be no doubt but that it is an appropriate remedy in the present case, unless it can be shown that the relator has a complete remedy by action. It is plain that he has not such remedy against the county treasurer, for he stands ready to perform the functions required of him. It is probable that an

action on the case would lie against the supervisor and commissioners, at the suit of the creditors, but the recovery would not necessarily be the amount due the party for interest on his bond, but a sum for unliquidated damages to be assessed by the judgment of a jury. But a right of action against the officer who ought to perform the duty, can never be an answer to a motion for a mandamus to compel its performance, because if this were so, the remedy would be taken away in nearly every case; for the right to an action for damages generally exists where a party is entitled to a remedy by mandamus against a ministerial officer. In *McCullough* v. *The Mayor, of Brooklyn* (23 Wend., 458), it was said by Judge BRONSON that, "although, as a general rule, a mandamus will not lie where the party has another remedy, it is not universally true in relation to corporations and ministerial officers. Notwithstanding they may be liable to an action on the case for a neglect of duty, they may be compelled by mandamus to exercise their functions according to law." See, also, the case of *The People* v. *The Supervisors of Columbia County,* to be presently mentioned for another purpose.

But the principal argument against the right to a mandamus in this case is that the relator has, as alleged, a perfect right of action against the town; and there are cases which favor this view. In *ex parte Lynch* (2 Hill, 45), the legislature had directed the supervisors of the City and County of New York to audit and allow the salaries of the judges of a certain city court, and Mr. LYNCH, one of the judges, moved for a mandamus, and the motion was denied on the sole ground that he had a remedy by action against the city corporation. This is certainly a strong case. The same principle was stated in an opinion in this court. (*The People* v. *The Supervisors of Chenango Co.,* 1 Kern., 563), but the judgment was, I think, placed on another ground, namely, that the relator had no right to the money which he sought by the mandamus to have raised by the action of the board of supervisors. See, also, *ex parte The Fireman's Insurance Company* (6 Hill, 243), where a mandamus to compel a corporation to transfer stock which the

The People *v.* Mead.

relator claimed to be entitled to, was denied, on the ground
he had an action against the corporation for a refusal to make
the transfer.   But I do not think these cases are fully in point
against the plaintiff.   None of them present the case of a pro-
ceeding prescribed by statute for raising money by a local tax
for the benefit of a class of creditors, where that proceeding has
been carried on according to law nearly to its completion, where
it has proved effectual in raising the money from the taxpay-
ers who were the proper parties charged with its payment, and
where the only step wanting to produce satisfaction to the
creditor is the payment of the money, so raised, into his
hands.   If the defendants are allowed to persist in refusing to
make payment, on the ground that the relator has a right of
action against the town, and they should act on that sugges-
tion and prosecute the town, the anomaly would be presented
of the legal pursuit by a creditor of money owing by the
town, which it had already raised and collected from the tax-
payers and placed in the hands of a public officer for the pur-
pose of being paid to his creditors — all in performance of spe-
cific statutory directions — but where in consequence of the
perversity of the official persons, whose duty it was made to
pay it over, it could not be obtained by the creditor.   Upon
the argument of the defendant's counsel, judgment must be
recovered against the town, which would have no means of
satisfying it without further legislation, while at the same time
the money collected specifically to pay such creditor must remain
in the hands of the treasurer, no person being by law entitled
to take it from him except these official persons, who refuse to
have anything to do with it.   It seems to me one of the most
appropriate cases for the remedy by mandamus against the
recusant officers which can be conceived.   The remedy against
the town, conceding that an action will lie against it, is inade-
quate; for towns are not presumed to have any property liable
to seizure on executions, and they have no power of taxation
which would enable them to raise this money again.   In the
cases *ex parte Lynch* and *ex parte The Fireman's Insurance Com-
pany*, the parties to whom the applicant for a mandamus was

referred, as those against which he had another remedy, were regular corporations with a full general liability to be sued, and in judgment of law had sufficient property to pay his claim; but a town has only limited corporate powers, and no powers whatever to become a debtor for borrowed money, or to provide for the payment of such a debt except what is con ferred by the act of 1852 (1 R. S., 337). That act does not contemplate a suit against the town in any event, and the only method which it provides for the payment of the debts, which it was thereby authorized to incur, was the one which has been pursued nearly to its proper consummation, but which has become ineffectual by the refusal of the defendants to perform the part assigned to them in the detailed arrangements for the satisfaction of the debt. The case is similar in principle, though far stronger for the application of the remedy than that of *The People* v. *The Supervisors of Columbia County* (10 Wend., 363). A statute had charged upon the respective counties any deficiency which might arise upon the sale of land mortgaged to the commissioners of loans, and had directed that the amount should be raised by the board of supervisors; and the case of such a deficiency having occurred in the County of Columbia, the Attorney-General procured a mandamus to compel the supervisors to do their duty by raising the money to meet the deficiency. The question was presented by a demurrer inter- posed by the Attorney-General to the return of the board of supervisors; and on the argument their counsel urged that mandamus was not the proper remedy, the county, as they con- tended, being liable to an action. The answer of the court to this position, as set forth in the opinion of Chief Justice SAVAGE, in giving judgment for a peremptory mandamus, contains all that is necessary to add upon this branch of the case: "Is this a proper case for *mandamus?* It has often been decided in England and by this court, that a mandamus will not be granted where there is a remedy by action. The party ask- ing for a mandamus must have a clear legal right, and no other appropriate specific remedy. (2 Cow., 444; 1 Wend., 325; 7 Term R., 396, 404.) If an action lies in this case then a man-

damus should be refused. I think an action would not lie. The statute directs the supervisors to levy and collect the amount of the deficiency; it is a duty imposed upon those officers which should be performed by them; but for this neglect, the county, in its corporate capacity, should not be punished; nor does any liability attach to the county to pay the money in any way other than that pointed out in the statute. Should it be thought that the offending supervisors ought to respond personally in damages, which is certainly very questionable, still there is no principle which would graduate the damages to the deficiency which would arise from the mortgage in question; and for aught the court can know, the money possibly might not be collected in that way. Besides, the law does not contemplate satisfaction in any other manner than by an assessment upon the taxable property of the county. An action, therefore, is not the appropriate and specific remedy." If the opinion should be thought to go too far in denying the liability of the county to an action, still the case is an authority for holding that where a particular method of raising money for local public purposes is prescribed by statute, the party entitled to receive it has a right to the full and perfect execution of the power conferred, which may be enforced by the writ of mandamus.

But it is insisted that it was incumbent on the relator to show that he was the holder of the obligations of the town issued under the act, which he had a right to enforce. I will not stop to inquire whether the defendants are not estopped from questioning the validity of the bonds after they have been used with the consent of the officers, as the means of obtaining the plaintiffs' money, and after the taxpayers have contributed, in the manner prescribed by law, to raise a fund for the purpose of reimbursing him; for I think the obligations are perfectly valid.

It is objected that the instruments are unauthorized, because they are not specialties; and it is argued that the word 'bond' used in the act can only be satisfied by an instrument under seal. But the towns do not have and are not supposed to

possess a common seal. There is no provision for the adoption of one or for its custody. But if the town had a seal it would not have been proper to affix it to these obligations; for the act directs that they shall be executed in another manner, namely, under the official signatures of the supervisor and railroad commissioners, and these instruments were authenticated in that manner. Whatever force there may generally be in the words "bond or bonds," which were used in the act, it is overcome by the explicit direction as to their execution, which has been mentioned.

The obligations were not issued upon the making of a loan of money, but were transferred to the railroad company in payment for the stock subscribed in behalf of the town. In *Starin* v. *The Town of Genoa*, decided at the last term (23 N.Y., 439), it was the unanimous opinion of the court that this was unauthorized by the statute, and we reversed the judgment which the plaintiff had obtained, for interest payable upon certain of the bonds, on the ground that they could only be legally issued to secure money advanced by way of loan. The propriety of that judgment is exemplified by the facts in the present case, which show that the railroad company realized only $750 on each obligation for the payment of $1,000, and that thus the town would be obliged to pay between nine and ten per cent per annum upon the money which came into the hands of the company to be applied towards the improvement in which the town was assumed to be interested, besides being holden to pay at the maturity of the loan, if the transaction were upheld, one-quarter more money than had been ever realized and applied to the object contemplated. This was in hostility to the direction that the interest to be paid for this money should not exceed seven per cent. But in the case of Starin, the plaintiff purchased the bonds directly from the company, with a knowledge that it had received them in payment for the stock and not upon a loan, and he consequently stood in the place of the company. In the present case I am of opinion that the relator occupies the position of a *bona fide* holder of commercial paper, and is not liable to the defence

which existed against the railroad company as the first holder of the obligations. The instruments are negotiable upon their face, and they have all the requisites of promissory notes. If a corporate seal would prevent their being held to be nego tiable, (which since the case of *The Bank of Rome* v. *The Village of Rome*, 19 N. Y., 20, cannot be maintained), no defence would arise from that circumstance, for they are simple contracts, and not specialties. The statute does not in terms direct them to be issued in a negotiable form, but it does not forbid it, and as public and corporate securities invariably contain words of negotiability, the supervisors were well warranted in issuing them in that form. The relator, it is true, purchased them at a discount, and if, instead of being payable in twenty years, they had been active mercantile paper, maturing in a few months, that circumstance might have deprived the relator of the character of a *bona fide* holder. But it is not at all an unusual transaction to sell State or municipal bonds, or corporate securities at a price below par. These securities must have been entirely unknown in the money market in New York, and considering that they were payable at so great a length of time, and bound only one of the interior farming towns, it is rather surprising that they brought so large a sum. There is nothing in the circumstance that they were parted with at that price to affect the purchaser with the imputation of bad faith. On this ground I am in favor of holding that the relator is not prejudiced by the fact that the bonds were first negotiated to pay the stock instead of being issued upon a loan.

But the relator is chargeable with knowledge of the terms of the statute, and that the town officers had no authority to act unless the requisite assent of two-thirds of the taxpayers had been obtained. He produced papers purporting to be signed by a great number of persons assuming to be resident taxpayers of Genoa, but did not prove the genuineness of the signatures, nor that the names were on the assessment-roll; but he produced also from the files of the clerk's office the affidavit of the then supervisor and commissioners, annexed to

the paper containing the signatures, affirming the facts required by the act to be shown, namely, that the several persons whose written assent was thereto attached composed two-thirds of all the resident taxpayers in said town of Genoa on its assessment-roll made and completed next previous to the date of the affidavit. It will be seen that this sworn statement affirms, by a necessary implication, the genuineness of the signatures of the subscribers, and the correspondence of those names with the taxpayers inscribed on the roll, and affirms positively that they constituted the required proportion of all the names on the roll. It would be sufficient to sustain the judgment in this case, if the affidavits were considered *prima facie* evidence of the facts stated in it, for although evidence was given by the defendants tending to contradict these statements, it does not appear that the judge determined the question of fact in favor of the defendants; but inasmuch as he decided that the statute had been complied with, he must be considered as having found the fact against the defendants if such finding was necessary to support the judgment. But it is very clear to my mind that the affidavit was conclusive evidence, in favor of a *bona fide* holder of the obligations, that the requisite number of assents had been obtained. In *The Bank of Rome* v. *The Village of Rome*, just mentioned, which was an action to recover on bonds issued by the defendants as a municipal corporation, the statute authorizing them had provided that a certain amount of stock in the railroad company, should be subscribed by other parties, before the commissioners of the railroad fund, whom the town was required to elect, should have any authority to issue the bonds, and those commissioners were also required to make a certificate that such subscriptions had been obtained before they could issue the bonds. There was nothing in the act which in terms made the certificate evidence of the performance of the preliminary act. That was left to be inferred, as it is in this case, from the character of the act to be performed, and its apparent bearing upon the authenticity of the obligation to which it related. In both cases the preliminary act was one which it would be impossible for one desirous of lending on the bonds satisfac-

The People *v.* Mead.

torily to ascertain. The act therefore devised that method of determining it. The defendants, on the trial of the case on the Rome bonds, offered proof tending to show that valid subscriptions to the required amount had not been obtained, which proof was rejected; and we held that the certificate was conclusive evidence of the fact in favor of *bona fide* holders of the bonds. The case is parallel in principle with the one before us, and ought, I think, to determine the question against the defendants. It has been suggested that the effect claimed for the affidavit was considered and pronounced against, in *Starin* v. *The Town of Genoa,* above mentioned. I understood the judgment in that case to have been placed upon the ground that the bonds were not issued upon a loan, and that the plaintiff was not a *bona fide* holder of the paper so as to claim a better right than the railroad company had. Some of the judges thought it incumbent on the plaintiff to prove that the requisite number of assenting taxpayers had been obtained. Such indeed was the reasoning of the opinion of Judge LOTT, to which I expressed my dissent, and my impression was that it was concluded to place the judgment wholly upon the position that no money had been borrowed on the bonds, and that the plaintiff was not a *bona fide* holder.*
Upon that point all the judges agreed, while upon the other there was a difference of opinion.

Entertaining these views, I must vote for affirming the judgment of the Supreme Court. A number of the judges, however, sufficient to pronounce a judgment, are in favor of reversal on the single ground that it was not shown that two-

---

* The reporter understood otherwise, as appears by his head note to the Starin case. The decision in this case by the same judges is some evidence that he was not mistaken. It is true that no distinct question was taken upon the point,— but the reporter, noting the observations of each judge, as they expressed themselves *seriatim* upon the case, found that a majority concurred then upon the point on which the present adjudication is put. He has thought it advisable to report this case that the point, which was certainly not necessarily involved in the previous judgment, may now be seen to have been authoritatively adjudicated.

thirds of the resident taxpayers of the town had signed the written assent, and that the affidavit does not supply the defect of proof. The judgment will therefore be reversed, and a new trial be awarded.

DAVIES, J., concurred with DENIO, J., for affirmance. The reporter understood all the other judges to concur with him that mandamus was the proper form of remedy, but they were for reversal for the reason stated.

Judgment reversed, and new trial ordered.