The opinion of the court was delivered by
Brewer, J.:
statement of the case. This is an application to this court for a writ of mandamus commanding the levy of a tax to pay the coupons on certain bonds issued by the county of Bourbon to the Tebo & Neosho Railroad Company, and by it sold and transferred to the plaintiff. Two questions exist, and are discussed by counsel in their briefs with great ability. First, had the county commissioners the authority to issue these bonds ? and second, if not, can this -want of authority be set up as a defense to an action by the present plaintiff, who claims as a bona fide holder for value ? The material facts are these: On the 8th of March 1867, without any prior petition therefor, the county commissioners of Bourbon county ordered “that an election be called on the first Tuesday in May 1867 for the purpose of submitting the question of voting $150,000 to any railroad running east to connect with the Tebo & Neosho railroad as per order published.” The order published proposed to subscribe $150,000 “to the capital stock of any railroad company now organized, or that shall hereafter be organized, that shall construct a railroad commencing at a point on the Tebo & Neosho railroad running westward via Fort Scott, and that the bonds of said county be issued to said company for the same.” On the 10th of May thereafter, being the Friday next succeeding the *201 first Tuesday of May, the county commissioners, as the record shows, made a canvass of the votes. In this record appear in- one column the names of the townships, and in columns opposite the number of votes for and against the proposition. The columns are added, and show 468 votes for the bonds, and 442 against. Then follows this recital: “Majority for bonds, 26 votes — audit was declared that there was a majority of twenty-six votes cast for railroad bonds, and it is also further certified that there was no evidence of an election having been held in the townships of Franklin and 'Walnut.” This record is not signed by the commissioners, nor attested by the clerk. The poll-book from Franklin township was filed in the county clerk’s office on that day, placed with the poll-books from the other townships, and has been there kept ever since. It appears however from the testimony that it did not reach the county clerk’s office, and was not filed, until after the commissioners had left the .office. This poll-book showed 4 votes fin, and 134 against the proposition, which with the votes already counted would make a majority of 104 against the bonds. On the 23d of July 1869, more than two years after this election, the record of the commissioners shows that application was made by the officers of the Tebo & Neosho Eailroad Company for a subscription to the capital stock of this company in pursuance of this vote (of 1867, as canvassed,) and that the county board resolved that it was not advisable then to make the subscription. At the same time an order was made submitting to the voters the question of issuing bonds to a company building a road west from Fort Scott. At the close of that order appears the following recital:
“And whereas, some question has arisen as to the propriety and legality of subscribing the stock and issuing the bonds provided for by the election of the 7th of May 1867 to the Tebo & Neosho Eailroad, and whereas, it is considered that the foregoing order, in addition to the one affirmed on the 7th of May 1867 aforesaid, will be generally satisfactory to the people of this county, it is therefore ordered and provided, that the decision of this question by the qualified voters of *202 said county, at the said election, in favor of such subscriptions, shall be also a decision in favor of the former subscription of the 7th of May 1867 being made at once to the Tebo & Neosho Rld. Co., and the board of county commissioners will accordingly in such case make the subscription authorized by said election of May 7th 1867, and will issue the bonds therein provided for as soon as the terms and conditions of said subscription are complied with by said .Railroad Company.”
A -canvass of the votes cast at this election showed 1428 votes for, and 703 against the proposition. This result was declared by the canvassers, and thereafter the bonds were issued, and for value transferred to the plaintiff.
Upon these facts four questions are raised as to the authority' of the commissioners to issue the bonds.1 First: "Was the presentation óf a petition signed by one-fourth of the qualified voters a condition precedent to any action by the commissioners, and without which no power to issue bonds passed to the county authorities? Second: Did the failure to name the railroad corporation avoid the whole proceedings? Or, as counsel have stated the question in their brief,'“ Could a subscription be made to the stock of the Tebo & Neosho Rid. Co., under and by virtue of the order of March 8th 1867, and the vote of May 7th 1867, that corporation not being named as the recipient of the proposed subscription?” (This question is discussed more fully by counsel in a case submitted subsequent to this, that of the Mo. River, Ft. Scott & G. Rid. Co. v. Miami County, and we may have occasion to refer to the briefs and arguments in that case.) Third: A majority of votes having been cast (May 7th, 1867,) as a matter of fact against the proposition, were the county board authorized to subscribe the stock and issue the bonds? Fourth: If no authority existed theretofore, did the proceedings of July 23d 1869, and the subsequent vote, confer authority?

3. Gooa faith; lion&hoiders.

*204
4. norms of Sions”!k Protection of people.

*202 Before noticing these specific questions it may be proper to consider an argument which is often used in cases of this kind, and pressed with great force and ability by counsel jn this — the argument of good faith. The county gave the bonds to obtain the road; it has obtained the road; *203 therefore, in good faith, it should pay the bonds. The company has fully complied with its contract; the county ought to do the same. The public conscience is weakened, and public morals suffer, wherever a municipality avoids its contracts through any technicality. Credit is shaken, and confidence undermined, whenever promises to pay are repudiated. Considerations of this kind, however appropriate for individual consciences, and as a guide to individual action, can never overthrow settled rules of law. A party may have given to another his note. Every consideration of honor and good faith may demand that he pay it; but if suit be not brought till five years from its maturity have passed, and the statute of limitations be pleaded, the courts must sustain the defense. Mere good faith will never give a cause of action; it is only when so connected with other considerations as to present a case of equitable estoppel, that the courts can interfere. Courts will never make a contract because they think the parties ought to have made one. Again, in cases like this, the bondholder is not the only party who can rightfully press the demands of good faith. The taxpayer is entitled to equal consideration. He is guarantied protection in property as well as person. He may not be heard in the courts to restrain the issue of these securities. If the authorities, through stupidity, or collusion, are" placing a burden upon his estate, he is powerless to prevent it. Craft v. Comm’rs of Jackson Co., 5 Kas., 518. A new election may enable him to change these officials, but the wrong is already done. He has a right then, in the name of good faith, to demand of the court that no charge shall be left on his property unless legally placed there, and that no contract shall stand unless legally made. More than that he has no right to ask; less than that he ought not to receive. True, he is not a nominal party to this action; but is the real party in interest. The simple inquiry then, in cases of this kind, should be, whether the forms of law have been so far complied with that a valid contract has been made. If they have, the contract should be sustained, and the bondholder have his judgment. If they have not, then the county should *204 have judgment. No considerations of supposed good faith will justify a court in making and then enforcing a contract between the parties. As protection to the taxpayers, the law has prescribed certain forms of . proceeding, that nothing be done without their consent. These forms are all the protection the taxpayer has; and it is only by insisting on an observance of these forms, as a condition of valid action, that any security is afforded to him. If they are to be frittered away by judicial sanction, it were better to dispense with them altogether, and give the authority to the county commissioners to act without the delay and expense of first consulting the voters.
I. We shall not stop to discuss the first question raised, but will dispose of it by simply saying that if this were the only objection we should deem it cured by the act of 1868. (Gen. Stat., 892.)
5. Voting railroad bonds. Corporation to be named. II. No corporation was named in the proceedings of March 1867, as the recipient of the proposed subscription and bonds. The proposition in effect was, whether authority should be granted to the commissioners to take stock in any corporation “ now organized, or that might hereafter be organized, that should construct a railroad from the Tebo & Neosho railroad westward ciaFort Scott.” That a vote authorizing a subscription to one corporation will not sustain a subscription to another, even though the latter build the very line of road contemplated by the former, and sought to be secured by the vote, is settled. (St. Jos. & D. C. Mid. Co. v. Comm’rs of Nemaha Co., 10 Kas., 569. See also Marsh v. Fulton County, 10 Wall., 676.) The question now is, whether under the statute the people must select the corporation, or may they delegate authority to the commissioners to make the selection. The statute reads: *205 question shall first be .submitted to a vote of the qualified electors of the county,” etc. (Laws of 1866, p. 72, ch. 24, § 1.)
*204 “Sec. 1. The board of county commissioners of any county •to, into, through, from or near which, whether in this or any other state, any railroad is or may be located, may subscribe to the capital stock of any such railroad corporation in the name and for the benefit of such county, not exceeding in amount, * * * but no such bonds shall be issued until the

*205
6. Grant of countyto issue bonds.

*206
„ , „ „ 7. Authority of commissioners.

*207
corporation namea.

*205 This statute grants to the commissioners an extraordinary power. The constitutionality of such legislation has been questioned, though sustained. Its wisdom has been denied, even when its constitutionality has been sustained. . To prevent abuse of this power, a specific and express authority from the voter is required. ■ The manner of proceeding to obtain this authority is prescribed. Without legislative sanction, the assent of a majority of ^e voters would not bind the county, nor make vajj¿ lj0ncXs issued in pursuance thereof. (Pendleton County v. Amy, 13 Wall., 304.) The assent of a majority binds the county no further than the legislature has provided it shall, and a statutory power so liable to abuse should not by construction be enlarged beyond the plain warrant of the language used by the legislature. What is the county board empowered to do? It may make a subscription to the capital stock of a railroad corporation. A subscription is a contract. A contract requires two parties. There can be no subscription of stock, without a corporation to receive the subscription. The county was not authorized to pledge its funds to aid in building a railroad. It could not bind itself to give so much for a road. The railroad project might be aided, it is true, but only by virtue of the' fact that the corporation had obtained a responsible subscriber for a large amount of its stock. But before the board could make a subscription to the capital stock of any railroad corporation, the question must be first submitted to a vote of the qualified electors. What question? Manifestly the question of making the subscription, entering into the contract with the railroad corporation. The whole question, not a fragment of it; the question of authority to make the contract, not a contract. The whole authority delegated to the board by the first clause of the section rests upon the éxpressed assent of the voters. It is an entire thing; it is the consummation of a contract; and to it, as an entirety, the people *206 must assent. It may be said that the language used contemplates the submission of only the question of issuing bonds. “No such bonds shall be issued until the question shall be first submitted.” “If a majority of the votes cast at such election shall be in favor of issuing such bonds, the board of commissioners,” etc. But the issue of bonds is the last act of the board, the consummation of the contract. Bonds are to issue only in payment of stock already subscribed. If the language limits the question to that of issuing bonds, it limits it to that implies a subscription already made, a 'contract already entered.into, and therefore an existing and named corporation, the recipient of the subscription, and the party to the contract. In the arguments made in the case of the Mo. River, Ft. S. & Gulf Rld. Co. v. Miami County, to which we referred, some stress is placed upon the use of the verbs'“is,” or “may be,” in the first sentence of the section which authorized the commissioners of any county “to, into, through, from or near which, any railroad is, or may be, located, to subscribe to the capital stock of any such railroad corporation;” and it is claimed that “is” is used in a continuing sense, and refers not to the time of the passage of the law, but the time of making the subscription, and that therefore the addition of words “may be” contemplates a location subsequent to the. subscription. In support of that claim the case of James v. City of Milwaukee, decided by the U. S. supreme court, and reported in Chicago Legal News of Feb. 22d, 1873, is cited. It is unnecessary to determine whether the citation supports the construction, or whether the construction is correct. For the corporation must exist before it can locate its road; and all that such construction would warrant is, that the subscription might be made, and therefore might be authorized, before the corporation had finally located its road, and not that it might be authorized before any corporation existed. The citation might be pertinent, and the construction demand examination, if the language had been, “any railroad corporation which is or may be organized.” It *207 may be asked, what difference does it make? The thing to be secured is the railroad, and if that be accomplished it is enough. We reply, the legislature has not authorized counties to give their bonds simply to secure railroads. It has authorized them to take stock in railroad corporations, and pay for it in bonds. It makes the same difference to a county that it does to an individual, as to the corporation in -which stock is proposed to be taken. The county, like an individual, might be willing to take $150,000 of stock in a corporation whose capital stock was only $250,000, thereby securing the control of the corporation, while it-might not be willing to subscribe a like amount, or any amount, to one whose capital stock was $10,000,000, in whose control it would thus have little voice. Again, it might be willing to subscribe to and risk its funds with a corporation whose managers were men of known good character and financial responsibility, and not be willing to do the same with one whose controlling men were wholly irresponsible. The fairness and-good sense of the legislation is altogether on the side of the construction which the natural meaning of the language so plainly demands. It seems therefore that some corporation must be named as the recipient of the subscription and bonds, or the proceedings will be without warrant of law, and void.
8' election4 'emvass of votes. votesrcastof III. A majority of the votes cast at the election in 1867 were against subscribing stock and issuing bonds. This is an undisputed fact. The statute reads, “If a majority of the votes cast at such election shall be •.« n . ,, ___ _ . In *avor °* issuing such bonds, the board ot commissioners of the county shall issue the same.” (Laws 1866, p. 73, § 1.) That an election is a prerequisite to the issue of bonds, is unquestioned. Equally clear is it, that at such election a majority of the votes cast must be in favor of the issue. Power to issue, is not vested in the commissioners by virtue of their office, but given only by express authority of the voters. Issuing bonds without a vote, is no more ultra vires than issuing them against the vote of a majority. Express authority by an affirmative vote, is a *208 condition precedent to the existence of the power. These general propositions will not be disputed; and if the commissioners had at their meeting, on May 10th, 1867, canvassed the entire vote of the county, and declared the result in accordance therewith, (viz., a majority of 104 against the proposition,) no one would be foolhardy enough to claim that the commissioners had any power to issue these bonds given them by that election. It is claimed however that the commissioners were the proper canvassing officers; that at the legal time and place they made the canvass, and declared the result, and that the county is bound thereby. It must be conceded that this claim finds ample support in the language of some of the opinions of the supreme court of the United States. ' That tribunal has uniformly held that the determination of the county board was the adjudication of a competent tribunal, with full jurisdiction, and cut off all inquiry as to the facts upon which the determination was based; at least, "after the bonds had passed into the hands of a bona fide holder. In the case of the Comm’rs of Knox Co. v. Aspinwatt, 21 How., 539, Mr. Justice Nelson thus stated the proposition in his usual clear and forcible language:
“ Full power is conferred upon the board to subscribe for the stock and issue the bonds, when a majority of the voters of the county have determined in favor of the subscription, after due notice of the time and place of the election. The case assumes that the requisite notices were not given of the election, and hence that the vote has not been in conformity with the law. This would seem to be decisive against the authority on the part of the board to issue the bonds, were it not for a question that underlies it; and that is, who is to determine whether or not the election has been' properly held, and a majority of the votes of the county cast in favor of the subscription ? Is it to be determined by the court, in this collateral way, in every suit upon the bond, or coupon attached, or by the board of commissioners as a duty imposed upon it before making the subscription? The court is of opinion that the question belonged-to this board. The act makes it the duty of the sheriff to give the notices of the election for the day mentioned, and then declares, if a majority of the votes given shall be in favor of the subscription, *209 the county board shall subscribe the stock. The right of the board to act in an execution of the authority is placed upon the fact that a majority of the votes had been cast in favor of the subscription, and to have acted without first ascertaining it, would have been a clear violation of duty; and the ascertainment of the fact was necessarily left to the inquiry and judgment of the board itself, as no other tribunal was provided for the purpose. This board was one from its organization and general duties fit and competent to be the depositary of the trust thus confided to it.' The persons composing it were elected by the county, and it was already invested with the highest functions concerning its general police and fiscal interests. We do not say that the decision of the board would be' conclusive in a direct proceeding to inquire into the facts previously to the execution of the power, and before the rights and interest of third parties had attached; but after the authority has been executed, the stock subscribed, and the bonds issued and in the hands of innocent holders, it would be too late even in a direct proceeding to call it in question. Much less can it be called in question to the prejudice of a bona fide holder of the bonds in this collateral way.”
We have made this lengthy quotation because it contains as clear and complete a statement of the views .therein expressed as can anywhere be found, and also because it is from the leading case in that court. The views therein expressed have been uniformly adhered to by that tribunal: Bissell v. City of Jeffersonville, 24 How., 287; Morgan v. Miami County, 2 Black, 722; Gelpeake v. City of Dubuque, 1 Wall., 175; Mercer County v. Sackett, 1 Wall., 83; Van Hostrup v. Madison City, 1 Wall., 291; Supervisor v. Schenk, 5 Wall., 772; Pendleton County v. Amy, 13 Wall., 297; City of Lexington v. Butler, 14 Wall., 283. It will be observed that this language does not affirm that the determination of the county commissioners gives authority to issue bonds; but only, that that determination estops the county from denying the authority. All that is asserted, and all that can be found in any of the opinions, is, that that determination is- evidence of authority otherwise given, evidence that is conclusive in an action by a bona fide holder. It is like any other canvass — evidence, *210 nothing but evidence, of acts already done, and power already given. It is by universal consent open to inquiry and attack, unless made conclusive by statute, until at least rights have vested on the faith thereof. It is no more potent to confer authority, than a canvass of votes cast, for any office is to give a right to the office. It should not be so weighty, even, as evidence, for in the one case it is necessary that offices should be filled, and that evidence of who are entitled to fill them should be easily accessible, while in the other it is not necessary that county bonds should ever be issued to railroad corporations, and the people’s right to control the extent of their obligations should not be frittered away on a mere matter of evidence. The substantial question is, did a majority of the voters grant the authority; the formal question, what does the canvass show? Reverse the status for a moment, and suppose the canvass showed a majority of 26 votes against, while an actual majority of 104 votes was in favor of the proposition: would not the authority to issue pass to the commissioners? and would there be any question but that bonds thus issued, even in the hands of the obligee himself, could be enforced? “If a majority of the votes oast at such election,” is the language of the statute. Can the commissioners, by a canvass, destroy the power of the majority, and set at naught the will of the legislator? Can they in defiance of the statute create an authority in themselves? It rvas well said by the supreme court of Ohio in State, ex rel. Treadwell, v. The Comm’rs, &c., 11 Ohio St., 183: “ The decision of the supreme court of the United States must pest on the assumption that it was competent for the commissioners of Knox county by some act of their own to make their authority complete, an assumption we are not at liberty to make in this case.” In that case the county commissioners of any county, through or in which a railroad might be located by any corporation, were by statute authorized to subscribe stock and issue bonds. Under this statute bonds were issued, and passed into the hands of a bona fide holder. In mandamus proceedings thereon, the answer alleged that the railroad had never *211 been located through or in the county, and this answer was held good; and in holding it good the court use the language above quoted. And see, Starin v. Town of Genoa, 23 N. Y., 439; The People v. Mead, 24 N. Y., 114; same case, 36 N. Y., 224.

canvass, confers no s unauthorized

*212
Notice of want anthorit“y

. °f isos.

*211 We have thus far considered this question on the assumption that the statute designated the commissioners as the canvassing officers, and fixed the time'and place of the canvass. The contrary is the fact. No canvassing officers are named. No time or -place for the canvass indicated. The only general election law then in force, in its first section declares what elections are to be governed by its provisions, and they are, “ all elections hereafter to be held for state, district, and county officers.” (Comp. Laws, 490, § 1.) Under that law the county commissioners are ujade the canvassers, and the Friday succeeding the election the day for the canvass; (§ 27, p. 497.) Section 4 of an act providing for the election of township officers, (Comp. Laws, 504, as amended by ch. 58, laws of 1864, p. 100, § 1,) makes the commissioners canvassers for such election, and names the first Monday of April for the canvass. There are also many special elections provided for in the statutes, and as a general rule the several acts in terms declare that such election shall be conducted in the manner prescribed by the general election law. But the acts under which these bonds are claimed to have been voted, contain no such provision. (Laws 1865, p. 41, ch. 12; laws 1866, p. 72, ch. 24.) They provide that no such bonds shall be issued until the question shall be first submitted to a vote of the qualified electors of the county, at some general election, or at some special election to be called by the board of county commissioners, by first giving twenty days’ notice, in some newspaper published and having general circulation in the county, or in case there be no paper in the county, then by written or printed notices posted up in each election precinct, twenty days previous to the day of such election; and in submitting said question, said board of commissioners shall direct in what manner the *212 ballots shall be east. The express authority given is to order a special election, and to direct in what manner the ballot shall be cast. If they have any further power in the matter, it is either because of their general authority to represent the county, and manage its business and concerns, where no other provision is made, (Comp. Laws, 412, § 15, clause 5,) or because power to order an election carries with it the power to prescribe the manner of conducting it, and determining its results. An examination of the order of the commissioners shows that they .omitted to prescribe the manner of conducting the election, the time or place of the canvass, or to designate the canvassing officers. Notwithstanding the silence of the statute, and the omissions of the order, an election would doubtless be valid where the people generally acquiesced in the manner, and took part in the election. Here the evidence shows that all but one township took part in the election, and fails to show the relative population of that township, or that the voters in the others did not generally participate in the election. But while the election may be valid, (for it is a maxim that the will of the peopie should not be defeated by the omissions or irregularities of their officers and agents,) can it be that the commissioners can, without statutory authority, in the absence of notice to the voters, and before the returns are received from all the voting precincts, come together, and by canvassing only a portion of the vote create in themselves an authority which the majority of the voters have refused to grant to them? Can such unauthorized and partial canvass be even prima facie evidence of the authority? It seems to us doubtful; at any rate, when it carries on its face information that returns of the election have not been received from some townships, it is sufficient notice to put any one on inquiry as to the actual facts of the election, and the returns filed with the county clerk. It is claimed that the curative act of 1868, (Gen. Stat., p. 892,) applies, and makes valid this election. This cannot be, for that applies only to cases in which “a ma *213 jority of the persons voting have voted in favor of the subscription;” and here, as we have seen, a majority voted against the subscription. It was an act to cure irregularities, and sustain the will of the majority; and not an act to make form more than substance, and the canvass of the county commissioners more potent than the votes of the people.
it. Two propositions on one jote,megai. IV. No authority having been granted by the proceedings in 1867, was any conferred by those in 1869 ? The objections raised to the former do not apply to the latter. A corporation was named as the recipient of the aid, and a . majority of the votes cast were m favor of the proposition. But an equally fatal objection exists to this. The question submitted in 1869 was that of extending aid to a road west from Fort Scott. It was upon that the people voted, and to that gave their assent. The commissioners, it is true, by their order declared that if the people authorized aid to a road running west, they should consider themselves also authorized to subscribe to a road running east. Yet submitting only one question, they cannot by construction enlarge the authority actually given. That the question submitted was. also a railroad proposition, does not make any difference. They might with equal propriety, and legal warrant, have submitted a question of issuing bonds for a court-house, and then by construction made an affirmative vote a delegation of authority to issue these bonds. Can an agent thus by construction create -authority ? But it may be said, that, while this is the form of these proceedings it was practically and substantially a submission of both questions to be determined by a single vote. Conceding this to be the fact, and the difficulty, though lessened, is not avoided. The two questions were to be settled by a single vote. A vote for railroad bonds, was a vote in favor of both propositions; and so of a vote against. There was no opportunity of voting for one, and against the other. Such a submission was not warranted by the statutes. It may be conceded that two or more questions may be submitted at a single election, provided each question may be voted on separately, so that each may stand or fall *214 upon its own merits. But that is a very different matter from tacking two questions together, to stand or fall upon a single vote. It needs no argument to show the rank injustice of such a mode of submission. By it several interests may be combined, and the real will of the people overslaughed. By this combination an unpopular measure may be tacked on to one that is popular, and carried through on the strength of the latter. A necessary matter may be made to carry with it some private speculation for the benefit of a few. Things odious and wrong in themselves may receive the popular approval, because linked with propositions whose immediate consummation is deemed essential. It is against the very spirit of popular elections. That aims to secure freedom of choice, not merely between parties, but also in respect to every office to be filled, and every measure to be determined. A voter at a state election would be shocked to be told that because he voted for a person named for governor on one ticket, he must vote for all the other persons named thereon; or, that voting for one person he was to be understood as voting for all. He would feel that his freedom of choice was infringed upon. None the less so is it bysuch a submission as this This ' question is not' a new one to the courts. In Supervisors of Fulton County v. M. & W. Rld. Co., 21 Ill., 373, such a mode of submission was pronounced void in the following vigorous language: “The truth is,” says Breese, J., “the voters of Eulton have never had an opportunity to vote, and never have voted on this subscription, for the question was at no time distinctly before them. The question before them was, will you vote for a subscription to two roads? ]N either road has received the approving vote of the people; and until that is done, until the naked, single question shall be fairly presented to those voters, they ought not to be bound or injuriously affected by any such jockeying management, and log-rolling. This system, condemned as it has always been by the moral sense, as well as the sense of justice of the whole country, should at this day find no favor in the courts. We do not hesitate to say, this proposition to *215 vote on two roads at the same time was not authorized by the law, and i is a fraud on the people.” The same ruling was made in The People, ex rel., v. Tazewell Co., 22 Ill., 147; Clarke v. Sup’rs of Hancock Co., 27 Ill., 310. The same question was before the Iowa courts, and determined in the same way: McMillan v. Lee Co., 3 Iowa, 311. In giving the opinion of the court Mr. Justice Stockton says: “The law, according to the view that we have taken of its provisions, evidently contemplates distinctness and unity in each question or proposition submitted for adoption or rejection by a vote of the people. Each proposition submitted to such vote, should be. complete in itself, and should contain every requisite prescribed by the statute, as necessary to give validity and effect to the borrowing or expenditure of money, the subscription of stock, or the issue of county bonds.” A mode of submission which is so obviously unjust, so contrary to the spirit of election, and has received such condemnation from the courts,-will not be imputed to the intention of the legislature, unless necessarily demanded by the language used. The statute in force at the time of this election under consideration, was that of 1869. (Laws of 1869, p. 108, ch. 29.) So far as this question is concerned, however, it is not dissimilar to the acts of previous years. It authorizes the county commissioners to subscribe for and take stock or loan credit to any railroad company “upon such terms and conditions as may be prescribed,” provided a majority of the voters shall first “assent to such subscription.” Upon making the subscription, the county becomes “like other subscribers to such stock, entitled to the privileges granted, and subject to the same liabilities imposed by this act, or by the charter of the company in which such stock is taken.” The singular number is used all the way through. It contemplates a separate transaction with each corporation, provides for a subscription to be made upon terms and conditions; and in the nature of things these terms and conditions would vary with different roads. No one can read the sections without being impressed with the fact that each county was to make a sep *216 arate subscription, each corporation to receive a separate subscription, and each subscription to be authorized by a separate vote. The curative statute of 1868 impliedly recognized this fact. It provides that if a majority of the persons voting at any election prior to January 21st 1868, have voted in favor of subscribing stock and issuing bonds, the county commissioners may make the subscription, “whether such order and election, or either of them, have been iii compliance with the statute in such cases made and provided or not, or whether the proposition submitted at the election had, was for the subscription of stock and the issuance of bonds to one or more railroad companies.” Two things are thus aimed at: first, to cure all mere irregularities in the proceeding; and second, to make valid elections wholly unauthorized by the statutes. It seems, therefore, that the. statute requires a separate vote on the question of extending aid to each corporation; and if these proceedings (of 1869) are to be construed as a submission of two questions to a single vote, they were, in the language of Judge Breese, “not authorized by the law, and a fraud on the people.” It seems therefore clear, that neither .by the election of 1867, nor that of 1869, was any authority given to the commissioners to subscribe stock to the Tebo & Neosho railroad, or to issue these bonds.

County comSlgeiEttoxpayers.

*217
principal, when not bound by act of agent,

*216 IV. A graver question is now presented. Can this want of authority be shown as a defense by the county to this action of the plaintiff, who claims to be a bona fide holder for value, without notice? Without express provision of statute, the commissioners would have no authority to subscribe stock and issue bonds to a. railroad corporation. Every one dealing with the commissioners, or purchasing such securities, must take notice of the law under which they act. The act under which the commissioners assumed, to issue these bonds required, as a condition precedent to the vesting in them of any authority to issue, an affirmative vote of a majority of the voters, given upon a single proposition, and naming the proposed recipient of the subscription and bonds. Of this, every one purchasing bonds like these *217 must take notice. He knows that unless these conditions exist, these steps have been taken, the commissioners have no more power than the sheriff, or the county attorney, to bind the county. He knows that the commissioners cannot create the authority which the statute says the voters alone can give; that they are but agents, and agents, not with general power to act for their principal in matters of this kind, but requiring a specific and express authority for every single act of subscription. Charged with notice of all this, how can he assume that because they have acted, they must have been authorized? That these bonds are negotiable paper, does not alter the case, The law-merchant does not make the act of an . agent proof ox his authority. When power exists, which may be exercised under circumstances peculiarly within the knowledge of the agent, the exercise of the power may bind the principal as an affirmance by the agent of the existence of those circumstances. But this presupposes the existence of the power. Here, no power ever passed to the commissioners. The silence of the principal where the agent is acting often works an estoppel, as implying an acquiescence. But where the principal can do nothing else than be silent, where the individual taxpayers are powerless to restrain the act, (Craft v. Comm’rs Jackson Co., 5 Kas., 518,) the enforced silence can hardly be construed as an acqitftscence.

12 Recitals in bonds. Public records.

*218
„ holders.

*221
i4 Notice must .^0enof íecords.

*222
15 Reference in mentto™' anothei.

*217 It may be conceded that the language of Justice Nelson is broa,d enough to cover a case of this kind, and to make the act of the board in declaring their authority, and issuing the bonds, conclusive evidence of the grant of power by the people. Equally broad is the language of Mr. Justice Swayne, in Gelpcke v. City of Dubuque, 1 Wall., 175, where he said, “Where a corporation has power under any circumstances to issue negotiable securities, the bona fide holder has a right to presume they were issued under the circumstances which give the requisite authority, and they are no more liable to be impeached for any infirmity in the hands of such a holder than any other commercial paper.” That such a construction was not intended *218 to be given to the language of these citations, is evident from subsequent decisions of that court. In Marsh v. Fulton Co., 10 Wall., 676, the bonds of the county were issued, and in the hands of a bona fide holder, and the county commissioners were by statute authorized to issue bonds upon a previous affirmative vote of the electors of the county. Yet as such vote had not been had, the court unanimously held the bonds void, even in the hands of the bona fide holder, q>he bona fide holder had no right to presume they were issued under the circumstances which gave the requisite authority. He was bound to take notice of the county records, and. they showing no authority, none existed. "We cannot do better than quote the language of Mr. Justice Field: “ It is a case too, where the holder was bound to look to the action of the officers of the county, and ascertain whether the law had been so far followed by them as to justify the issue of the bonds. The authority to contract must exist before any protection as an innocent purchaser can be claimed by the holder. This is the law even as respects commercial paper alleged to have been issued under a delegated authority, and is stated in the case of the Floyd Acceptances, 7 Wall., 676. In speaking of notes and bills issued or accepted by an agent acting under a general or special power, the court says: ‘In each case the person dealing with the agent, knowing that he acts only by virtue of a delegated power, must at his peril see that the paper on which he relies comes within the power under which the agent acts, and this applies to every person who takes the paper afterward, for it is to be kept in mind, that the protection which commercial usage throws around negotiable paper cannot be used to establish the authority by which it was originally issued.’ ” And in another place, replying to the claim that because some interest had been subsequently paid, the original proceedings were made valid and good, he says: “The supervisors possessed no authority to make the subscription, or issue the bonds, in the first instance, without the previous sanction of the qualified voters of the county. The supervisors in that particular were the m ere *219 agents of the county. They could not therefore ratify a subscription without a vote of the county, because they could not make a subscription in the first instance without such authorization.” It may be remarked here that the bonds in that case contained no recitals of proceedings of the county board, or of a vote of the people, but were simply naked promises to pay. The same is true of the bonds in this suit. The effect of this on the question may be considered hereafter. Pendleton Co. v. Amy, 13 Wall., 297, is a still later case in that court. In that Mr. Justice Strong, for the court, after alleging that it was the duty of the county officers to determine whether a vote had been had according to law, and what the result was, uses this language: “To issue the bonds without the fulfillment of the precedent conditions, would be a misdemeanor, and it is to be presumed that the public officers act rightly. We do not say this is a conclusive presumption in all cases, but it has more than once been decided that a county may be estopped against asserting that the conditions attached to a grant of power were not fulfilled. (21 How., 539; 24 How., 287; 2 Black, 722; 1 Wall., 384; 5 Wall., 772.) This estoppel in these cases was either by recitals in the bonds, that the conditions precedent had been complied with, or by the fact that the county had subsequently levied taxes to pay interest on the bonds.” In one of the early cases, Bissell v. City of Jeffersonville, 24 How., 287, Mr. Justice Clifford says: “Whether we look to the bonds, or the recorded proceedings, there is nothing to indicate any irregularity, or even to create a suspicion that the bonds had not been issued pursuant to a lawful authority; and we hold that the company and their assigns, under the circumstances of this case, had a right to assume that they imported verity.” It appeared that copies of the proceedings of the county board were shown to the plaintiffs in that case at the time they received the bonds. It seems a fair inference from these citations that all the supreme court of the United States have decided is, that when either the bonds, or the records of the county, contain a recital of an election, and all other conditions precedent, as prescribed *220 by the statute, the county is concluded by that recital, and may not show that as a matter of fact no election took place, or that some other condition precedent never existed. With such a construction of the law we have in this case no occasion to differ. The bonds sued on contain no recitals, and the records show a non-compliance with the statute. An examination of the decisions of other state courts shows a disposition to place the construction we have given upon this general language of the United States supreme court, or else to disagree with the views expressed by that tribunal. We have had occasion to notice the decision of the supreme court of Ohio: 11 Ohio St., 183, cited supra. See also Hoppel v. Brown Tp., 13 Ohio St., 311; State, ex rel. Beckel, v. Union Tp., 15 Ohio St., 437. The supreme court of Iowa, in Clark v. The City of Des Moines, 19 Iowa, 199, had occasion to notice these rulings, and after citing the language heretofore quoted from Judge Swayne, says: “Suppose a city charter expressly authorized the common council to issue negotiable securities for corporate debts, and that the mayor and recorder without any order of the council fabricate, manufacture such securities, and that they find their way into the hands of innocent purchasers : it cannot be that Judge Swayne means that the ‘ bona fide holder has a right to presume that they were issued under the circumstances which gave the requisite authority/ and yet he says so. The true rule is, that the want of corporate power, or. the want of authority in the municipal officers, cannot be supplied by their unauthorized acts or representations.” And in accordance with that rule the case was decided, all the Justices concurring. To the same effect is the case of Veeder v. The Town of Lima, 19 Wis., 280, in which the court, (Mr. Justice Cole dissenting,) held that the recitals in the bond were not conclusive, and dissented squarely from the U. S. court as to the effect of those recitals. The cases of Starin v. The Town of Genoa, and Gould v. The Town of Sterling, 23 N. Y., 439, and 456, are strongly in point. The legislature of that state authorized by separate acts these towns to issue their bonds in aid of railroads, provided the *221 written assent of two-thircls of the resident taxpayers was first obtained and filed in the clerk’s office. The court of appeals held, reversing the judgment of the lower court, that the bondholder, suing on bonds issued by these towns by virtue of these acts, must prove affirmatively that the written assent of the requisite number of taxpayers was in point of fact obtained and filed, and that the town was not bound by the representation of its officers upon the face of the bonds •that such assent had been obtained and filed. In the latter case, Judge Selden, replying to the claim that the recitals in the bond created an estoppel, says: “The agents here were designated, not by the town, but by the legislature; and no power whatever was conferred by the town unless the assent of the taxpayers was obtained. Any representation, therefore, by the supervisor and commissioners in respect to such assent, would be a representation as to the very existence of their power. Such representations, as we have seen, are never binding upon the principal.” The same doctrine was sustained by the subsequent cases of The People v. Mead, 24 N. Y., 114, and 36 N. Y., 224. In his work on Const. Limitations, Judge Cooley, commenting upon the doctrine of Gould v. Sterling, says: “This doctrine appears to gcmn(j^ ^at whenever a want 0f power exists, a purchaser of securities is chargeable with notice of it, if the defect is disclosed by the corporate records, or as in that case, by other records where the power is required to be shown.” (Eor a further discussion of this question, and other authorities, see the note at the foot of page 216 of that work.) The difference between the federal and state courts is this: the former hold the county concluded by the recitals of the board, the latter that the bondholder is chargeable with notice of whatever appears upon the county record. Both agree that where there are no recitals on the face of the bond, and the want of authority appears on the county records, the bonds are void, even in the hands of a bona fide holder. These bonds contain no recitals of an election, or other proceedings of the county board, but are naked promises to pay. At the *222 close of the obligatory words, they read, “By order of the board of commissioners of the county 0£ Bourbon, dated March 8th, 1867.” The purchaser therefore is notified on the face of the instrument of the particular order under which the bonds were issued. Claiming under one instrument which recites the existence of another, and refers to it as the authority for its own existence, is he not charged with notice of the contents of the latter ? 1 Story’s Eq., § 400.
We have given this case, and the questions involved in it, full and careful and patient consideration, both on account of the amount in controversy here, and because' of the many interests which may be affected by the decision of these questions. The conclusions we have reached are, that the proceedings of March 8th 1867 were void because no railroad corporation was named as the recipient of the proposed subscription and bonds; that the election of May 7th 1867 conferred no authority, because a majority of the votes cast were against the granting of authority; that for a like reason the curative act of 1868 did not apply to that election; that 'the proceedings in 1869 conferred no authority, because no question of issuing these bonds was submitted to the voters of Bourbon county, and because an attempt to submit two questions to a single vote is unauthorized by the statute, and a fraud upon the people; that there being no recitals on the face of the bond, the county is not concluded by the mere fact that the commissioners issued them, even in favor of a bona fide holder; that the want of authority to issue appears on the records of the county, and that the purchaser is referred to those records by the bond itself, and is chargeable with notice of their contents.
It follows therefore that judgment must be entered in favor of the defendants.
All the Justices concurring.