bursements, and ten dollars costs of the motion in the court below.

DANIELS and LAWRENCE, JJ., concurred.

Ordered accordingly.

*THE PEOPLE EX REL. THE NEW YORK AND HARLEM RAILROAD COMPANY *v.* WILLIAM F. HAVEMEYER, MAYOR OF THE CITY OF NEW YORK.

*Mandamus — when proper remedy against public officer — when not denied though action may be brought — legislature —judgment of, not subject to be reviewed by the courts — State Constitution, chap.* 702 *of* 1872; *art.* 1, §§ 6, 9; *art.* 3, § 16; *art.* 10, §§ 2, 6.

When an act of the legislature directs an officer of a municipal corporation to sign a warrant for the payment of public moneys (already raised by taxation) upon certain things having been done, and it is conceded that the provisions of the act have been complied with, a proceeding by mandamus is the proper one by which to require the officer to sign such warrant.

Conceding that an action might be brought to enforce the payment by the corporation, that does not preclude the party from proceeding by mandamus.

The legislature has the power to judge of the relative benefits resulting to a municipal corporation and a railroad company, from an alteration in a public avenue over which the railroad track passes, and its judgment is not subject to review by the courts.

A municipal corporation like an individual, may, by neglecting to object when it ought to speak, waive its right to insist upon the performance of a contract which has been violated by the acts thus done without objection on its part.

If the title of an act fairly and reasonably announced the subject, and that is a single one, and if the various parts thereof have respect or relate to that subject, the provision of the Constitution that no local or private bill shall embrace more than one subject, and that shall be expressed in the title (State Const., art. 3, § 16) is complied with. The degree of relationship of each provision is not essential if it legitimately tends to the accomplishment of the general purpose.

The provision of the State Constitution which declares that every law which imposes, continues or revives a tax, shall distinctly state the tax and the object to which it is to be applied, and it shall not be sufficient to refer to any other law to fix such tax or object relates to the State finances. The affairs of cities and counties, so far as they are regulated by the Constitution, are treated of in other provisions.

The creation, by the legislature, of a board of State engineers, to superintend a work in changing the tracks of a railroad on the highway, in a municipality, is not a violation of article 10, section 2, of the Constitution in relation to the appointment of certain officers, nor is the assent of two-thirds of the members

* This opinion was delivered at the New York Special Term, August, 1874.

elected to each branch of the legislature (State Const., art. 1. § 9) necessary to give validity to such act, where it appropriates moneys raised by tax in the municipality for the purposes of such work.

The public moneys referred to in that section are those belonging to the State, and not those raised by taxation upon a locality for an improvement.

Statute and constitutional rights, existing in favor of a party, natural or artificial, may be waived.

Application for a peremptory mandamus by the relator to compel the respondent, as mayor of the city of New York, to countersign a warrant, drawn by the comptroller of the city, pursuant to section 7 of chapter 702 of the Laws of 1872, entitled "An act to improve and regulate the use of the Fourth avenue, in the city of New York."

Westbrook, J.:

The New York and Harlem Railroad Company was created by a special act of incorporation, passed April 25, 1831; and various acts amendatory thereof, and supplemental thereto, have since been enacted. Prior to the passage of the act of 1872 (to enforce the duty devolved upon the respondent thereby, as is alleged, is the object of this application), the relator had located, constructed and operated a double-track railroad upon the Fourth avenue, in the city of New York. This was with the consent of the corporation of the city. By chapter 387 of the Laws of 1859, entitled "An act to extend the charter of the New York and Harlem Railroad Company, and to determine the mode of using the same in the streets of New York," the corporation was "authorized, empowered and permitted to use steam in drawing their passenger and freight cars upon their railroad in the Fourth avenue, to and from the northern extremity of Manhattan or New York island to the south side of Forty-second street, in said city, with turnouts, to their engine houses, respectively, for a period of thirty years from the 1st day of December, 1858." Section 3 of the act just referred to "extended for the term of thirty years from the passage of this act" "all the rights, privileges and franchises given and granted to the New York and Harlem Railroad Company, in and by their act of incorporation, passed April 25, 1831, subject to all the restrictions of the said act, *except as herein modified.*" Prior to the said act of 1859, the relator occupied the streets of New York with their railroad track, under a contract with the city, which bears date January 9, 1832. That contract enabled the common council of that city to determine when the railroad should become an obstruction and impediment to the enjoyment of the street by the public, and to direct the railroad company to provide a remedy therefor, under the penalty of the removal of its track.

When the Fourth avenue was originally occupied in part by the railroad, the sparseness of the population was such that the occupation gave but little inconvenience. As the city, however, expanded northward, it was found necessary to provide remedies for the danger and obstruction to the general public resulting therefrom, and with a view to a partial remedy at least, by a law passed in 1867 (chap. 880) a portion of the avenue was arched over, leaving the railroad track below, at the joint expense of the city and the company. According to the evi-

dence contained in the moving papers (and this is not denied), the completion of the work authorized by the act of 1867, was of great benefit not only to the railroad company, but to the city; so much so, that it was deemed advisable to improve and grade the entire avenue, and by means of sinking the tracks at points where it was practicable, and bridging the avenue at others, to make the use thereof by the railroad company compatible with its proper use as a street by the public. To carry out this scheme the Law of 1872, under which this proceeding is pending, was passed. By the first section of the act just referred to, the nature and character of the work which "The New York and Harlem Railroad Company is authorized and required to do," is specified. The second section authorized the laying down of "such additional temporary tracks on the Fourth avenue, above Forty-second street, as may be necessary for the railroad business, during the progress of the work," and after providing for the removal of such temporary tracks, when the work should be completed, it further authorizes the company, "for the purpose of facilitating rapid transit and accommodating local traffic, to lay down permanently two additional tracks on said avenue, and to make such landings and excavations in said avenue as may be required for such additional tracks, with landings for the entrance and delivery of passengers outside of the said excavations and viaduct." By the sixth section, a board, to be called "The Board of Engineers of the Fourth Avenue Improvement," was created to take charge of, manage and direct the work. It is made the duty of such board "to file a monthly statement, under oath, of the items of their expenditure, with the comptroller of the city of New York." By the same section the members of the board are named "Allen Campbell, Alfred W. Craven, or their successors, and the chief engineer of the board of public works of the city of New York, and the engineers of the New York and Harlem Railroad Company." Directions are given for the keeping of minutes of their transactions; their compensation is fixed; provision is made to fill vacancies, and for appointment of a general superintendent of the work. They are required to prepare plans and specifications of the improvements, and an estimate of the expense thereof, and file a copy of such plans, specifications and estimates in the office of the comptroller of the city of New York; and they are further required to take an oath or affirmation faithfully to perform their duties. Section 7 provides that one-half of the cost of the work shall be borne by the New York and Harlem Railroad Company, and one-half by the city as the work progresses, and "when and as often as it shall appear, by the certificate of the superintending engineer of the work upon said improvement, that the sum of $25,000 has been expended thereon by the New York and Harlem railroad, specifying the portions and divisions of the said improvement, where the said expenditure has been made, the comptroller of the city of New York shall draw his warrant upon the treasury of the said city, in favor of the treasurer of the said railroad company, for one-half of said sum, *which shall be duly signed and countersigned by the proper officers of said city*, and delivered to the railroad company for and on account of the one-half of the expense and cost of said improvement, to be borne and paid by the said city as aforesaid."

Section 8 provides that one-half of the estimated cost of the improvement which is to be borne by the city shall be raised by taxation upon the real and

personal property, and one-half thereof shall be included in the tax levy of 1872, and the other half in the tax levy of 1873. The comptroller of the city is directed to issue revenue bonds to meet the amount to be paid by the city, and the section thus concludes: "It is hereby intended and declared that the payments of the city of New York are to be made in the proportion and as fast as they are made by the said railroad company during the progress of the work, on the said improvement." By the ninth section, the city of New York is "forbidden to obstruct the said improvement, or the use of the Fourth avenue for that purpose, above Forty-second street, and the common council is directed to pass and adopt such ordinances as may be requisite or necessary to facilitate the said improvement." By the tenth section the board of engineers is charged with completing the improvement as rapidly as possible, and when completed, the New York and Harlem Railroad Company, and such other companies as obtain from it a right so to do, are authorized to run trains by steam over the various tracks, etc.

After the passage of this act the relators proceeded, under the direction of the said board of engineers (which board has pursued each and every step required by the law to be taken), to make the improvement. The city of New York raised by tax, including it in its tax levy of 1872, one-quarter of the whole estimated cost of the improvement, and there was collected and paid into the treasury of the city the sum of $1,587,000.50 to meet its share of the cost of the work.

By the act of April, 1873, payments by the corporation of the city of New York must be made through the proper disbursing officer of the department of finance on vouchers to be filed in said department, by means of warrants *drawn on the chamberlain by the comptroller, and countersigned by the mayor.* Connected with the finance department is an audit bureau, which, under the supervision of the comptroller, is required to audit, revise and settle all accounts in which the city is concerned as debtor or creditor, the chief officer of which is called the auditor of accounts.

On the 14th day of May, 1874, a certificate, precisely in conformity with the provisions of the act under which the improvement is making, was made out by the superintending engineer, and delivered to the comptroller of the city of New York, certifying that $276,466.90 had been expended upon the improvement, specifying the portions and divisions of the same where the expenditure was made.

The auditor of the bureau of accounts (Abraham L. Earle), having duly examined the certificate, certified a claim for one-half thereof to the comptroller, which latter officer drew a warrant for one-half the amount of the certificate of the superintending engineer, to wit: for $138,233.35, and duly signed the warrant, which warrant was also countersigned by the mayor. After the mayor (William F. Havemeyer) had countersigned the warrant, which, as before stated, was also signed by the comptroller (Andrew H. Green), he caused his name to be taken therefrom, and now refuses to countersign the same, though he has been requested so to do. The money wherewith to pay the said warrant was then, and now is, in the treasury of the city, and the application by the relator is for a peremptory mandamus against the respondent to compel him to countersign the said warrant.

No disputed question of fact arises upon this application. No question of fraud, collusion, or attempt to cheat the city out of a dollar is urged. There is

no pretense but that the board of engineers has honestly, conscientiously and impartially done its duty, and that the warrant drawn by the comptroller, which the mayor now refuses to countersign, represents just one-half of the money actually and judiciously expended by the relator in making the improvement required by the Law of 1872. On the contrary, the opposition to the mandamus is based upon three grounds only: First, that a mandamus is not the appropriate remedy; second, that the certificate includes the cost of temporary tracks for running trains during the progress of the work, and sundry other items, which, though lawful and authorized by the statute of 1872, are not proper to be charged to the cost of the improvement for one-half of which the city is liable; and third, that the law is unconstitutional for sundry reasons, and on various grounds urged and stated upon the argument, and which will be noticed in detail hereafter.

The full statement of the facts which has been given, readily shows that there is no question of fact to be sent to a jury for trial, and therefore no alternative mandamus need be granted. The amount of money due from the city has been adjusted, determined and ascertained by a tribunal specially organized and created for that purpose, and which, composed, as it was, of men of conceded integrity, ability and learning, acting under the sanctities of an oath, was infinitely better qualified to discharge that duty than any court or jury possibly could be. Unlike a court, which, to ascertain facts, must rely upon evidence of others, this board had personal knowledge of the truth and right of their judgment, the work having been done under their supervision, and according to their plans. Unless then this application must fail and be defeated, for the objections taken and hereinbefore stated, there is no reason why this court should not and ought not to dispose of the whole case as involving questions of law only, and, if its views coincide with the position of the relator, grant the writ asked for in a peremptory form.

The objection that a mandamus was not the proper remedy, was argued preliminarily, and disposed of prior to hearing the argument upon the merits. It may not be improper, however, as this case is one of great public interest, to state briefly the reasons which influenced that decision: Assuming the validity of the act of 1872, the doing the work, the honest expenditure of the money, and all the facts set out in the moving papers (all of which must be assumed in disposing of this preliminary objection), a plain duty was imposed upon the respondent by the statutes of that State, one which was imperative and mandatory, the non-discharge of which worked gross wrong and injustice to the relator. No other remedy was adequate and proper to meet the case. The tax-payers and all the officers of the corporation, other than the respondent, had faithfully and completely discharged their various duties. The money had been collected and paid into the city treasury; the auditor, under the direction of the comptroller, had certified to the justice of the claim; the comptroller had drawn his warrant for the amount, and the only obstacle to its payment was the want of a counter-signature of the mayor, who (all this must be conceded in asking a refusal of the writ on this ground), without reason and without cause, declines to affix his name to a warrant which the law declares he shall do. What other remedy will meet this case? Granting, for the

sake of argument, that an action could be maintained against the corporation for labor performed, and moneys expended under the act (which, as the law specially provides for the ascertainment of the claim, the mode of raising the money and its payment, I do not believe), what propriety is there in subjecting the municipality of the city of New York (as well as the relator) to the costs and expenses of an action at law to enforce a claim which every tax-payer and officer thereof, except the mayor, desires to have paid, and has done all in his power to have discharged? Within every principle which has ever been held upon the writ of mandamus, it must be the proper remedy. No other will reach the evil and devolve the costs of the proceedings where they belong, if the points urged upon the merits do not justify the mayor in refusing to perform the official act.

The reasons which influenced us in holding that a mandamus is the appropriate remedy in this proceeding, are fully sustained in *The People* v. *The Supervisors of Columbia County* * and *The People* v. *Mead.* † In the latter case, Judge DENIO, in commenting upon some decisions which have been strenuously urged to this court, says: "But I do not think these cases fully in point against the plaintiff. None of them presents a case of a proceeding prescribed by statute for raising money by a local tax for the benefit of a class of creditors, where that proceeding has been carried on, according to law, nearly to the completion, where it has proved effectual in raising the money from the tax-payers, who were the proper parties charged with its payment, and when the only step wanting to produce satisfaction to the creditor is the payment of the money, so raised, into his hands. If the defendants are allowed to persist in refusing to make payment, on the ground that the relator has a right of action against the town, the anomaly would be presented of the legal pursuit by a creditor of money owing by the town, which it had already raised and collected from the tax-payers and placed in the hands of a public officer for the purpose of being paid to its creditors — all in performance of specific statutory directions — but when in consequence of the perversity of the official person, whose duty it was made to pay it over; it could not be obtained by the creditor." This is the exact course of argument which influenced us in overruling the motion to dismiss the proceedings upon the ground that the remedy asked for — a mandamus — was not the appropriate one; and with a single further citation from the same opinion of Judge DENIO, in which he comments upon the other case we have cited (*The People* v. *The Supervisors of Columbia County*), we close the discussion of this preliminary objection: "If the opinion should be thought to go too far in denying the liability of the county to an action, still the case is an authority for holding that when a particular method of raising money for local public purposes is prescribed by statute, the party entitled to receive it has a right to the full and perfect execution of the power conferred, which may be enforced by the writ of mandamus."

But it is further objected (and this objection goes to the merits of the application), that the certificate given by the superintending engineer, and for one-half of which the comptroller of the city drew his warrant, includes items not expressly chargeable, under the act of 1872, to the cost of the improvement. If this objection be well taken, the amount of the illegal charges embraced in the

* 10 Wendell, 363      † 24 N. Y., 114; see pages 120, 121, 122, 123.

certificate is of no consequence, and hence the application for a reference to ascertain the exact amount of such improper charges was refused. The certificate could only include such items as the law aforesaid authorized, and if it was made up in part of sums unauthorized, the application for the writ would be refused if such amount was great or small. The items objected to are: First, the cost of maintaining temporary tracks to run the trains whilst the work progresses; second, the necessarily enhanced cost of doing the work whilst a portion of the avenue is occupied by operating the railroad, and to obviate which it is claimed that the trains should have been stopped at the Harlem river; third, the construction of two additional tracks to secure rapid transit; and fourth, the ten per cent, which, in the estimate of the entire cost of the improvement, is allowed for contingencies. In regard to the latter item, no part of it enters into the certificate for which the comptroller drew his warrant; that representing money actually expended. The appearance of this, in the general estimate of the whole cost of the work, made prior to the commencement of the undertaking, was proper and usual, to apprise those interested of the possible amount of money required. It was placed where it was, so that a sufficient sum might be raised to cover any expenditure which the proper performance of the work made necessary, and to make the fund against which the certificates were thereafter to be given, adequate for their payment. As to the other items, something further will be said.

To the second point, that the cost of the work is necessarily enhanced by the occupation of a portion of the avenue during its progress by the operation of the railroad thereon south of Harlem river, and which increased cost by reason thereof is admitted, the act itself furnishes a sufficient answer in plain terms. The second section authorizes the laying down of "such additional temporary tracks on the Fourth avenue, above Forty-second street, as may be necessary for the railroad business during the progress of the work." From this express permission, the inference is irresistible that the work was to be carried on with the Fourth avenue, occupied in part by the business of the railroad. The legislature evidently supposed, as we can readily conceive, that the city was vitally interested in the uninterrupted flow of its commerce, through this, one of its great arteries, and that such uninterrupted flow was of more pecuniary consequence to it than the enhanced cost, caused by its interruption. If allowed to judge of the soundness of this legislative opinion, we would cheerfully announce ours to be in accordance with theirs. But we are not, as the fundamental law of the State has wisely committed such considerations to the sound wisdom and practical sense of the legislative department of the government, and it would ill-become the judicial bench to say that such discretion could be lodged anywhere with more propriety or more safety.

As to the other two objections, the cost of the temporary tracks and the two additional permanent tracks to secure rapid transit, we think they are not well taken. The first five sections of the act designate the improvement to be made, and what may and should be done during its progress. Among these, is the one which provides for doing the very things, to the imposition of one-half of the cost of which upon the city, objection is made. It is impossible to separate these

acts from the others which are directed to be performed. After the character, nature and extent of the work have been indicated in these five sections, the next (the sixth) creates the board of engineers "to execute, direct and superintend the construction of the said improvement," and then sections 7 and 8 prescribe the share of the cost of "the said improvement," which the city is to sustain, and direct how the money shall be raised and paid out to accomplish the object. No rule of construction would justify the limitation attempted upon the words "the said improvement." All had been previously specified as a part thereof, or as proper to be done in connection therewith, and if the legislature had intended that the city should bear one-half of the expense of only a part of the work previously authorized or directed, it would certainly have so declared, and not used an expression which must necessarily cover all.

Neither does this construction work so great injustice to the city as the counsel for the mayor argues. The legislature of the State* had power to authorize the relator to occupy the Fourth avenue with its tracks, and prescribe the mode of occupation. The permission to run cars over it, drawn by steam power, had been expressly conferred in 1859. Whatever control the city had over its occupation, by virtue of the contract with the company, was given to it by the law chartering the company. It was perfectly competent for the same body, under whose permissive authority the city acted, to deprive it of that power, and deal directly with the relator. It did so by the act of 1859, which unconditionally conferred the right claimed by the railroad. Such permission was not, as the learned counsel for the mayor argued, subject to the restrictions imposed by other acts, under and by virtue of which the city had undertaken to control the corporation in the use of the avenue, but such restrictions existed only, as the act declares, "except as herein modified." The act having in prior parts made express provision for the laying down of tracks, and the running of cars thereon by steam, and that too with the consent of the city, as it expressly declares, such use, granted for a term of years in an unqualified manner, must be deemed to be at least one of the modifications referred to. When the act of 1872 was passed, the legislature had before it the situation and rights of both the city and the relator. The former was vitally interested in the success and maintenance of the latter. The iron rail and the steam horse which linked it to the great country of which it was the commercial center, were as important and as vital to its growth as any of its other avenues which its wealth and enlightened public spirit have constructed. The improvement of this avenue, so as to admit of its use by the public and the railroad together, and the apportionment of the cost thereof upon some just basis, were the problems to be solved. Much of the work to be done properly belonged to the city, and much to the railroad. A separation of the one from the other, in its execution, would enhance the cost of it as a whole, even though the part properly belonging to each could be accurately designated. Under such circumstances the law was passed, by which the work was to be prosecuted as a unit under one plan and a single superintendence, while the cost was equally divided between the two. If a part of the whole can be selected, and an argument based upon it, to prove the city pays a part of

* The People v. Kerr, 27 N. Y., 188.

something it ought not to bear, so on the other hand, doubtless, the railroad company might argue, as to some other part, that it paid for something which benefited the city only. The truth is, that the work so runs together that its separation is impossible, and since the propriety of its execution is conceded by all, the apportionment of its cost could only be made by the legislative power in the exercise of its best judgment. We think it has acted wisely, equitably and justly, but if it has not, neither this nor any other tribunal has power to correct its errors. The work when completed will certainly not benefit the railroad company only, but the city equally as much. The exact proportionate benefit which each will receive, can never be accurately ascertained. It is enough to know that both will feel that the money expended has been judiciously employed, and a division made of its cost by a body empowered to decide that question.

Having endeavored to show that the remedy sought is an appropriate one, and that, if granted, the city will not pay anything unauthorized by the Law of 1872, let us now examine the various objections founded upon our Federal and State Constitution. It is claimed:

First. That it violates the clause of our National Constitution forbidding any State to pass a law impairing the obligations of any contract. It is argued that as the contract of January 6, 1832, between the city and the company, gave to the former the right to control the use of the avenue by the latter, the act of 1872, which takes from the city this power of control, substantially abrogates this agreement. To this we answer: First. Whilst discussing the previous objections, it was shown that the contract was annulled, with the consent of the city, by the Law of 1859, which definitely conferred the right to use the avenue by the propulsion of cars over the tracks, constructed upon its surface, by steam. This grant was absolute, and absolved the company from its contract of 1832, which had therefore ceased to exist when the present statute was passed. Second. Assuming that the old contract of 1832 was in force when the present statute was passed, it was competent for the city, if the old agreement was thereby improperly nullified, to make its objections. It, as a natural person, can waive its right and assent to a change or modification of its bargains. Like a natural person, it cannot fold its arms and make no objection when it ought to speak. It saw the machinery of the law being put in operation by an estimate of the cost of the work filed in the office of its chief financial officer; and in all that was done before the work began, and in the conduct of the same to the present time, one of its own principal officers (the chief engineer of the board of public works) took a leading and active part. No objection or notice is given to the relator that the provisions of the law are not in good faith accepted. On the contrary, it is allowed to make a contract, on the faith of a supposed acquiescence by the city, involving millions; the tax imposed is levied, collected and paid into the city treasury; hundreds of thousands of dollars are paid by the city in ratification of the new agreement which the law embodies; and now, at this late day, this objection is made, after every tax-payer and every officer of the city, not even excepting the mayor, who is now objecting, has expressly ratified and confirmed it. So far as it is possible for any being, natural or artificial, to waive any prior agreement, if one existed, the city of New York has done

so, and the point now for the first time taken cannot prevail. But, third. The city has no rights under the contract of 1832, so far as the use of this avenue by the relator is concerned, which the State is constitutionally bound to respect. The city, as we have shown under a previous point (*People* v. *Kerr*),[*] had control over the occupation by the railroad of the street by the force of a power conferred. The body which gave it the power could withdraw it, and exercise it for itself. It has done so, and that takes no inherent or vested right from the city. Second. It is said that it violates section 16 of article 3 of the Constitution of this State, which declares: "No private or local bill which may be passed by the legislature, shall embrace more than one subject, and that shall be expressed in its title." The title of the act is, "An act to improve and regulate the use of the Fourth avenue in the city of New York." The cases of *Brewster* v. *City of Syracuse* [†] and of *Ferdinand Mayer*, [‡] cover this objection. In the latter case it is decided: "If the title of an act fairly and reasonably announces the subject, and that is a single one, and if the various parts thereof have respect or relate to that subject, the provisions of the Constitution that no local or private bill shall embrace more than one subject, and that shall be expressed in the title (State Constitution, art. 3, § 16), is complied with. The degree of relationship of each provision is not essential if it legitimately tends to the accomplishment of the general purpose." And it was also in that case further held: "The general subject of local improvement includes not only the plan and construction of contemplated work, but the means by which the work may be accomplished, the proceedings necessary to be adopted for assessing and paying the expenses, and the remedies to parties for redress of grievances arising out of their construction." Tested by these rules there is no difficulty. When this law was passed, the public and the railroad company were in the joint use of this avenue, and the act declared by its title its object to be, to "improve and regulate" its use. No improvement could be made without cost to some one, and the reader of such title would naturally conclude that a tax would be levied somewhere to pay such cost; and as the use was principally confined to the two corporations, it could reasonably be conjectured where it would fall; and further, as the public and the railroad were both using the avenue, the portion of the title which indicated that its use was to be regulated, would naturally direct attention to the body of the act to ascertain how it was thereafter to be used. Every section of the act relates to this single subject, and the title could not be made any more specific without encumbering it with the details of the machinery devised for its execution, which the framers of the Constitution did not contemplate and did not intend.

Third. It is further argued that the law is in conflict with section 13, article 7 of the Constitution, which declares: "Every law which imposes, continues or revives a tax, shall distinctly state the tax and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object." If this objection is to prevail, what becomes of all the various statute laws authorizing city and village corporations throughout the entire State to make local improvements, appoint boards to assess and determine the costs, etc. ?

[*] 27 N. Y., 188.    [†] 19 N. Y., 116.    [‡] 50 N. Y., 504.

What, of various others creating special commissioners to ascertain and assess debts and damages due third parties from counties, towns, etc., and then directing the levy and assessment thereof upon the locality which should pay? If the legislature can authorize a municipality to make an improvement, appoint commissioners to ascertain and distribute its cost among those which, in their judgment, should bear it, and in such proportion as they think proper, why can it not, instead of delegating such power to others, act directly, and determine that a certain improvement shall be made; establish a board to direct and control its execution; apportion its cost as it thinks proper, and provide for its payment? Is there any greater exercise of power in one case than in the other? If power to do an act can be legally conferred, the body which can make the grant can exercise the right itself.

In *People* v. *Mayor of Brooklyn*,[*] by virtue of the power conferred in the charter of the city, Flushing avenue had been improved, and the cost of the improvement assessed in part upon certain parties supposed to be especially benefited, it was held this was a proper exercise of the taxing power. Will it be argued that if an act of the legislature had directly ordered the same improvement, had created a board to plan and execute the work, and had declared in the law itself what proportion of the costs the whole city should pay, and what part specific corporations and individuals should bear, that such act would not be equally valid with the one it did pass?

In *Town of Guilford* v. *The Supervisors of Chenango County*, [†] it was held that a law of the State appointing commissioners to ascertain the amount due from the town to certain parties, and directing the assessment of the amount awarded by the board of supervisors of the county upon the town, was a valid and constitutional enactment. That case, which, like the one we are considering, provided for the assessment of a tax, the amount of which was to be ascertained by the means specified therein, was certainly unconstitutional if the act of 1872 is, for the reason we are discussing.

Whatever plausibility the objection may have from the words of the section and article of the Constitution upon which the same is predicated, and whatever apparent contradiction there may be between it and the cases we have cited, are explained by the remarks of Denio, Ch. J., in *Darlington* v. *Mayor, etc., of New York*, [‡] who, in commenting upon the same article of the Constitution to which the learned counsel of the mayor has referred, says: " The article of which the section is a part, relates to the State finances, and taken together, it constitutes the financial system of the State, so far as concerns constitutional restraints. The affairs of cities and counties, so far as they are regulated by the Constitution, are treated of in other provisions." And precisely this explanation disposes of *People* v. *Board of Supervisors of Kings County*, [§] in its applicability to the case before us. The court had then before it a law imposing a State tax for State purposes, and that law was of course amenable to the article of the Constitution regulating that species of legislation. Its soundness is not questioned, but it does not sustain the point urged now.

[*] 4 N. Y., 420.      [†] 13 N. Y., 143.      [‡] 31 N. Y., 164; see pages 182, 183.
[§] 52 N. Y., 556.

Fourth. The objection that the creation of the board of engineers to superintend this work, is a violation of article 10, section 2 of the Constitution, in relation to the appointment of certain officers, cannot prevail. If the point be well taken, then the *Town of Guilford* v. *The Board of Supervisors of Chenango County*,* before cited, was wrongly determined. In that case the Court of Appeals had before it the constitutionality of a law appointing commissioners to determine the amount of a tax to be levied. So, also, if the position be sound, *Litchfield* v. *Vernon* † and *People* v. *Laurence* ‡ were wrongly decided. In these cases the constitutionality of an act, creating a special board of commissioners to do certain things relating to the closing of the Atlantic street tunnel, in the city of Brooklyn, and to assess the cost thereof, was affirmed. It would not be difficult to answer the objection, were it an original question, but such a discussion is neither profitable nor necessary in view of adjudged cases, which this court has no power to reverse.

Fifth. Neither is the law obnoxious to the first article of the Constitution, section 9, which provides: "The assent of two-thirds of the members elected to each branch of the legislature shall be required to every bill appropriating the public moneys or property for local or private purposes." No "*public* moneys," in the sense which the word *public* is used in that part of the organic law, are appropriated, so as to make a two-third vote of the legislature necessary. The use of the words *public* and *local* in the same section, forbids the thought that they are synonymous expressions, and the structure of the whole sentence is in opposition to the construction which attaches to each a similar meaning. It was very easy to say if that was the thought intended, that "no tax should be imposed for a local or private purpose upon the State or a locality, except by the vote of two-thirds of the members elected to each branch of the legislature." Instead of that, the expression indicates, as well as the good sense of the requirement, that the assent of two-thirds of the members was necessary when money belonging to the whole State was to be appropriated for the benefit of a part This construction makes the provision reasonable and proper, and demonstrates that the "public moneys," referred to in the section, are those belonging to the State, and that the clause of the Constitution cited is no limitation on the power of the legislature to assess or tax the cost of a local improvement upon a locality. Neither by the law is any "private property * * * taken for any public use," so as to make article 1, section 6 of the Constitution applicable. Taxation upon a locality for an improvement therein, is the exercise of a different power, whilst the constitutional provision just cited refers to the taking of property by the right of eminent domain. This distinction, ever since the able and exhaustive opinion of Ruggles, J., in *People* v. *Mayor of Brooklyn*,§ wherein it is most clearly stated and explained, has been well recognized in this State, and repeatedly followed.

Sixth. The last objection urged is, that "chapter 702 of the Laws of 1872 is also unconstitutional and void, in so far as it imposes the payment of this money upon the city of New York for the benefit of the Harlem Railroad Company, as the compelling of such payment is beyond the scope and purview of the legislative

* 13 N. Y., 143.     † 41 N. Y., 123.     ‡ 41 N. Y., 137.     § 4 N. Y., 419.

power." Assuming the truth of the statement contained in the point urged — that the tax is for "the benefit of the Harlem Railroad Company"— the objection is still without force. There is no such limitation on the taxing power of the legislature. In *Town of Guilford* v. *The Supervisors of Chenango County*,[*] before cited, in answer to an objection that the law imposing the tax was a mere gift to the parties in whose favor it was imposed, Judge DENIO said: " The legislature is not confined in its appropriation of the public money, or of the sums to be raised by taxation in favor of the individuals, to cases in which a legal demand exists against the State. *It may thus recognize claims founded in equity and justice in the largest sense of these terms, or in gratitude or charity.*" In *Litchfield* v. *Vernon*,[†] also before quoted, Judge GROVER [‡] speaking of the previously cited case, says: "In that case it was held that the legislature had the power to impose a tax upon the inhabitants to pay a claim that had no legal validity, and that could in no way be enforced against the town. In other words, that it was in the power of the legislature to impose a tax upon a locality for any purpose deemed proper, and that its power in this respect is not restricted by the Constitution of the State." The opinion of MASON, J., in *The People* v. *Lawrence*,[§] is to the same effect. The case of *People* v. *Batcheller* [‖] does not conflict with these views. It simply decides that a law requiring a town, without the consent of its inhabitants, to become a stockholder in a railroad company is unconstitutional. But the objection assumes a fact which is not true. The provisions are not for the benefit of the relator exclusively. This we have heretofore endeavored to show in this opinion. The proper improvement and use of the avenue by both the city and the railroad, and to make the one consistent with the other, were the results to be obtained. What part of the work justly belonged to the city and what to the relator, it was difficult to define with accuracy; and the work to be done by each was so interlaced, that it was deemed wise to direct its construction under a single plan. Perhaps from parts of this work the railroad receives the larger benefit and from others the city. The legislature, in its wisdom, has assessed the one-half part upon each. This power is nothing different from what is exercised in behalf of municipal corporations every day. A street is opened and graded through agricultural lands. In such a case the amount to be paid by a city or village, as a whole, is always considerable, and yet the objection was never made, or, if made, has never prevailed, that it was unconstitutional to tax the entire municipality for work, a part of which, at least, benefited individuals only. Such owners are presumed to pay for that part which specially benefits them in the assessments which they pay for such benefits, over and above their share of the general tax, to which they also contribute. So in this case the legislature has determined that one-half of the cost of the improvement, over and above its proportion of the tax levied upon the city, shall be paid by the relator as its share of the peculiar benefits resulting therefrom. It is not for this court to say that this apportionment is unjust. To that body, as the supreme arbiter under our Constitution, has the right to decide been committed, and with its decision this court has neither the power nor inclination to interfere.

[*] 13 N. Y., 143.    [†] 41 N. Y., 123.    [‡] Page 134.
[§] 41 N. Y., 137; see pages 140, 141, 142.    [‖] 53 N. Y., 128.

Doubtless, in the exercise of their great powers, they will often err, as any tribunal which is but human will, but no system of government has ever yet been devised, and none ever will be established, which shall in any department always do exact justice, and whose lawful powers, if stretched to their fullest extent, might not work injustice in particular cases. In the grant of power, much must be conceded to the discretion, good sense and integrity of the individual or body to whom it is granted; but the concession of that which is fairly given should never be withheld, because extreme cases can be supposed in which it might be exercised with danger to the public. Practically, it will generally be found that the danger is largely imaginary, and the injury claimed to be done, scarcely perceptible.

Before closing this opinion, it may be well to advert to another view, applicable as much to each of the objections urged, as to the particular one in connection with which it has been hereinbefore stated. Statute and constitutional rights, existing in favor of a party, natural or artificial, may be waived. May not the act of 1872 be regarded as the embodiment of an agreement between the parties, to which all have assented — upon which all have acted — and the withdrawal of either from which cannot be permitted, because by its conduct it has induced the other to incur responsibilities which, it may fairly be assumed, would not have been incurred, if the other had not assented? The relator accepted the law, by making the contract for the work which the act required it to make. The city, *through its officers*, accepted it, by no protest against its provisions; by allowing the chief engineer of its board of public works to become a member of the board of construction, which directed the work and controlled the expenditure; by using its machinery for the collection of taxes to assess, levy, collect and receive into the city treasury its one-half of the cost; by drawing warrants and paying over $1,000,000 thereon; *and, through its citizens,* by the payment of the tax levied for the city's share of the cost. Thus all parties have agreed — the city through every officer and every tax-payer. No rule of law and no rule of honesty should permit objections to prevail, which have been so fully and explicitly waived.

As against the respondent, however, the strength of the point founded upon the acquiesence of the city in the Law of 1872, has not yet been stated. Every tax-payer in the municipality has not only assented to the act, but actually executed it. As a law imposing a tax, if it may be so regarded, it has already spent its force by the assessment and collection thereof, and the obtainment of the money for this purpose only. Every tax-payer has actually paid his, her, and its proportion of the amount which the city was to pay, of the cost of this great improvement, into the city treasury; and all, except that part which has been paid over in execution of the law, still remains therein pledged to this object. It cannot be used for any other purpose without a fraud upon the parties from whom it was collected, and who paid it that this work should not fail. When the mayor refuses to countersign this warrant, as the law commands, he refuses, not in order to protect his constituency from money oppressively to be taken against their will, but to defeat their wishes, and to appropriate their means to some use other than that to which they have pledged and dedicated it. His action in so doing is not only contrary to the desire of the relator, but to that of the body

of the people whom he professes to represent, and whose voice he should obey. The citizens of New York have a right to insist that their means shall be used for the very purpose to which they have applied them, and none of their officers should be allowed to refuse to execute the trust which tax-payers, under the law, have committed to their official hands, in the belief that the provisions of such trust would be faithfully executed.

The result of my examination is, that the peremptory mandamus asked for should issue.

----

# THE EXCELSIOR PETROLEUM COMPANY, Appellant, v. MAGGIE B. LACEY, Executrix, and others, Executors, etc., of Frederick Lacey, Deceased, and others, Respondents.

*Referee — duty of on settlement of case — findings — when compelled to make — Rule 41.*

Upon the settlement of a case by the referee before whom it had been tried, the plaintiff prepared a number of findings in addition to those contained in the referee's report, upon all of which the referee passed, allowing some and declining to allow the others. Subsequently the plaintiff moved for an order requiring the referee to find for or against all of the findings requested by him on the settlement. *Held*, that the motion was properly denied. That as the referee had allowed or declined to allow all of the proposed findings, he had done all that he was bound to do.

An express refusal by a referee to find as requested, must be deemed a ruling to the effect that the evidence would not justify such finding, or that, if found, the fact would not be material to the issue.

The proper practice to be pursued upon the settlement of a case by a referee, stated.

Appeal from an order of the Special Term, denying a motion to send back a case to a referee for further findings.

*Wm. H. Dickinson,* for the appellant.

*Man & Parsons,* for Lacey's executors.

*George P. Andrews, Benj. T. Kissam* and *George C. Blanke,* for other respondents.

Davis, P. J.:

This case was tried before a referee, who reported in favor of the defendants. The plaintiff made a case with exceptions, and on the settlement of the same, proposed to the referee a large number of