## A. T. & SANTA FÉ RAILROAD CO. v. COMM'RS OF JEFFERSON CO.

1. MUNICIPAL BONDS, IN AID OF RAILROADS; *Curative Act of 1868*
   The curative act of February 25th 1868, (Gen. Stat., p. 892,) was intended to cure irregularities in the proceedings had in any county on the question of county subscription to railroads, and to remove all technical hindrances to the carrying into effect of the will of the majority. It was not designed, and did not have the effect, to legalize illegal votes, or to authorize a county subscription of stock and issue of bonds without the vote of a majority of the qualified electors of the county voting upon the question.

2. ——— Upon the testimony presented in this case it is apparent, and the court finds, that a majority of the qualified electors of Jefferson county voting upon the question did, on the 7th day of January 1868, vote against subscribing to the capital stock of the Atchison, Topeka & Santa Fé Railroad Company.

*Original Proceedings in Mandamus.*

THIS action was commenced in this court in September 1872. On the return of the alternative writ of mandamus, the defendants moved to quash the writ because the action was brought in the name of *"The State of Kansas,"* as plaintiff, instead of the *Railroad Company*, the real party in interest. This motion was sustained at the January Term 1873; (11 Kas. 66.) The proper amendment being made, the defendants answered, setting up several defenses. One of these defenses was *res adjudicata*—alleging and setting forth a decree rendered by the United States circuit court for the district of Kansas at the May Term 1870. The plaintiff moved to strike this defense from defendants' answer, and said motion was heard and decided, and sustained, at the July Term 1873 of this court; (12 Kas. 127.)

The action is brought to compel the defendants to issue and deliver to plaintiff the bonds of Jefferson county, to the amount of $150,000, in payment of the subscription of that county for that amount of the capital stock of the plaintiff company. The petition for mandamus alleges that on the 6th of December 1867, the board of county commissioners of Jefferson county made an order submitting to the voters of the county the question of subscribing for the stock of the plaintiff to the amount of $150,000, and issuing the bonds of the county in payment therefor; that on the 7th of January 1868, the election was held, that a majority of the votes cast were in favor of the proposition submitted, and that the county commissioners duly met, canvassed the vote, and declared the result, (showing that 862 votes had been cast in said county in favor of said proposition, and 776 against it—or, a majority of 96 in favor of the subscription;) that on the 14th of January 1869, the county commissioners, by their proper officers, made a subscription in writing for the stock in accordance with the terms and conditions mentioned in the proposition submitted at said election, which subscription was reported by the county board, and by it approved;

that on the 17th of February 1869, said subscription was duly accepted and received by the plaintiff, and thereupon the company entered upon the work of constructing its road, and in all respects has fully complied with the requirements of law, and the terms and conditions of the subscription made by the county. The petition also alleged that the plaintiff's railroad was completed through Jefferson county in May 1872, and that on the 5th of June thereafter a certificate of the chief engineer of the completion of said road was duly filed with the county clerk, as required by law. On the 17th of June 1872, the plaintiff tendered the stock to the county commissioners, and demanded the bonds of the county, and the commissioners refused to accept the stock or to issue the bonds. Upon this state of facts the plaintiff commenced this action. As a defense to plaintiff's action, the defendants allege that the election-order of 6th December 1867 was made without the necessary and proper petition therefor; that more than a hundred illegal and spurious votes were cast in favor of the proposition at the election of 7th January 1868; that a majority of the *legal* votes cast at said election were against making the subscription and issuing the bonds; and that the subscription to the stock of said *Railroad Company* made by order of said county commissioners on the 14th of January 1869, was wholly without authority of law, and void.

Upon the trial of the issue so joined, a vast amount of testimony was taken and submitted, the character of which is sufficiently stated in the opinion, *infra*. The briefs and arguments of counsel are voluminous, but being mainly upon questions of fact, they are omitted.

*John Martin*, and *M. H. Case*, for plaintiff.

*Thacher & Stephens, Keeler & Gephart*, and *L. A. Myers*, for defendants.

The opinion of the court was delivered by

BREWER, J.: This is a proceeding in mandamus, brought originally in this court, to compel the issue of one hundred

and fifty thousand dollars of the bonds of defendant in pay-
ment of a subscription of a like amount of the capital stock
of the plaintiff. The vote on the question of subscribing
this stock and issuing these bonds was had on the 7th of Jan-
uary 1868, and the canvass by the county commissioners
showed a majority in favor of the subscription and the bonds.
The defendant challenges that vote, claims that a large num-
ber of illegal votes were cast, and that a majority of the quali-
fied electors voted against the subscription and the bonds.

Two principal questions are presented, one of law and the
other of fact. The question of law arises on the force and
effect to be given to the curative statute of 1868;
and this, if resolved in favor of the plaintiff, will
waive the necessity of any inquiry into the ques-
tion of fact. Sec. 1 of the act referred to, an act approved
February 25th 1868, and by its terms applicable to all cases
in which the election was held prior to January 21st 1868,
reads as follows:

*1. Municipal bonds in aid of railroads. Curative act of 1868.*

"Whenever a majority of the persons voting at any election
called by the board of county commisioners of any county
have heretofore voted in favor of subscribing stock and is-
suing bonds to any railroad company or companies, the board
of county commissioners of such county may subscribe to the
capital stock of such railroad company or companies to the
amount and on the conditions specified in the orders of such
boards of county commissioners in such cases, and pay such
subscriptions by issuing, to each company, bonds of such
county, at par, * * * *whether such orders and elections, or
either of them, have been made in compliance with the. statutes
in such cases made and provided, or not*, or whether the propo-
sition submitted at the election had was for the subscription
of stock and the issuance of bonds to one or more railroad
companies." (Gen. Stat. 892.)

The contention of plaintiff is, that this act in effect legal-
izes all votes put in the ballot-box; that the phrase, "persons
voting," includes *illegal*, as well as *legal* votes; and that it
was the intention of the legislature to preclude all inquiry
back of the returns. On the other hand, defendant insists
that the intention and effect of this act were simply to cure

all defects in the election proceedings, to uphold the will of the majority, and prevent its defeat by any technical omission. The argument of plaintiff is plausibly and forcibly put, by its learned counsel. He says that the legislature had unquestioned power to authorize county boards to subscribe for stock in railroad companies, and issue county bonds in payment therefor, without first submitting the question to a vote of the people, and cites in support thereof, *McCulley v. The Mayor,* &c., 3 Head, (Tenn.) 317; *Shelby Co. Court v. C. & O. Rld. Co.,* 8 Bush. (Ky.) 209; *McMillen v. Boyles,* 6 Iowa, 304; *McMillen v. The Co. Judge,* 6 Iowa, 391; *K. C. St. J. & C. B. Rld. Co. v. The Aldermen,* &c., 47 Mo. 349; *State, ex rel., v. Nodaway Co.,* 48 Mo. 339; *Napa V. Rld. Co. v. Napa Co.,* 30 Cal. 435. And proceeding with his argument, counsel for plaintiff states, that—

"Prior to this curative act of 1868, the state had run wild on the railroad question, and a mania had seemed to seize the public mind, that railroads were projected in all directions, that every town and village was to be advanced immediately to the rank of a city by means of railroads, and every community to grow rich from them; that this excitement necessarily led to excesses and extravagances on the part of the people of counties, cities and townships, and bonds were recklessly voted to imaginary and worthless railroad enterprises. The legislature was largely influenced by this so-called 'spirit of enterprise' that pervaded the whole body politic. The result was, that bad and carelessly-framed laws were passed on the subject. No attempt was made to restrain this feeling, by wise and wholesome legislation. Upon the contrary, it was encouraged. New plans and schemes were devised by each succeeding legislature to encourage what was delusively termed 'the spirit of enterprise,' 'the grand policy of public improvement,' and 'the development of the wonderful resources of the country.' Under this unnatural system, and a disastrous public policy, much had been and was done. In many instances, capitalists, acting in perfect good faith, had been induced to invest their money and property in these railroad enterprises, and had been encouraged and induced to do so by the anxiety, the pledges and promises of the people, individually and in their corporate and representative capacities. Under the pressure of excitement and

anxiety on the subject of railroads, it is unquestionably true, that many irregularities occurred in calling and conducting the elections. Is is equally clear that illegal and fraudulent voting occurred at very many of these elections. In fact, a fair and honest bond or county-seat election is of rare occurrence; and the same statement is unfortunately true of nearly all elections. We may and do regret this fact, but it is a fact, nevertheless. We do not justify it. It is a wrong to the public, and to individuals, to be condemned at all times and under all circumstances. The people knew of the existence of these irregularities, and of such illegal voting; the men who had invested their money in railroads thus created, knew it; the legislature knew it. * * * Every thoughtful man knew that this unreasonable excitement on the subject of building and aiding railroads must end sometime, and that when the end should come, that the very men who had been the most active promoters of it would be the loudest and most violent in their efforts to undo their work. One extreme follows another. The most radical advocates of a popular proposition of to-day, are the most radical opponents of that same proposition as soon as it becomes unpopular. They are the quickest to find fault with, and condemn the very acts that they were guilty of in the midst of this popular excitement. They accept cheerfully the benefits that have accrued to them and to the public as the results of the excitement, but are ready to doubt the morality and question the propriety of their former actions in producing these benefits. The truth of this proposition, in its full force, is clearly and forcibly illustrated by the evidence of witnesses in this action. The legislature knew that after the roads were built, and this popular excitement had subsided, and the public were in the enjoyment of all the benefits accruing from such enterprises, that pay-day must come; that in many cases the people would be doomed to disappointment in their estimate of the benefits and advantages that would result from these railroad enterprises, and that when they were confronted with these disappointments, and pay-day should come, and even after they had obtained the real advantages of a good railroad, that they would seek out some advantage, real or technical, to avoid a compliance with their contract, and prevent the payment of their debt, and that every failure to fully realize their expectations would be attributed to some fault of the railroad company, and that they would seek every possible advantage or opportunity, fair or unfair, to avenge

their disappointments, and avoid the very burdens that they had imposed upon themselves. Having a full knowledge of the truth of all these matters, and for the purpose of preventing controversies respecting the legality and regularity of such elections, and of the persons voting thereat, and as a matter of sound public policy, the legislature enacted the law now under consideration.

"Now, in view of the condition of affairs existing at the time of the passage of this act (of February 25th 1868,) is it not clear that it was the intention of the legislature to make valid and binding *all contracts* and agreements thereafter made, and all proceedings theretofore had under the laws then in force, whether the orders and elections out of which such contracts, agreements and proceedings grew had been in compliance with the statutes in such cases made and provided, or not? We think it was. If this act was not intended to do the things expressed in it, then it becomes a dead letter, and is incapable of construction or any rational solution. If, however, it means what the language used clearly imports, it is immaterial whether a petition asking for the election was ever presented — even if it was required, which we deny. Is it material whether the judges and clerks were sworn? Is it material whether the election proclamation was published one or twenty days before the election, or whether it was published at all? Is it material whether the election returns were regular, or irregular, or whether any returns were made at all? Is it material whether one, or twenty, propositions for taking stock in as many different railroads were submitted at the same election?. Is it material whether the persons who voted at such election were *legal,* or *illegal* voters? Are not all these matters involved in the *legality and regularity of the election,* and the question whether the election had been in 'compliance with the statutes'? If illegal votes were cast at such an election, would it be in *compliance with the statute* in such case made and provided? Certainly not; but it would be a clear violation of the law on that subject. From this fact does it not clearly follow, that *illegal voting* was one of the matters that was intended to be remedied by this act — one of the things that had been done *not in compliance,* but in violation of the statute respecting such elections, and therefore made valid? It was illegal acts, and illegal acts of this kind, that the act in question was intended to correct and make valid. This view of the case is strengthened by the very first lines in the act, as follows:

'Whenever a majority of the *persons voting* at any election called by the board of county commissioners of any county have heretofore voted in favor of subscribing stock,' etc. Does not the use of the phrase, 'persons voting' at such election, have precisely the same effect as if the act in express terms *legalized all votes put in the ballot-box* at such election? Does it not mean exactly that? and is it not clear, that the legislature intended to do precisely that thing? We submit that this is true, and that the legislature had the power to do this, if it had the power to legalize the election in any other respect."

We have made this lengthy quotation from the brief of counsel, as showing in all its fullness and strength the argument in favor of the construction put upon the law by the plaintiff. To that construction we cannot assent, and will endeavor to give briefly our reasons therefor. Without entering into any discussion of the question, whether the legislature has power to authorize a county to subscribe to the capital stock of a railroad company without a previous assent of a majority of the electors, and conceding for the purposes of this case that it has, it is still a fact that it is against the course of our legislation on the subject. Uniformly the legislature has deemed it right, if not essential, that they who must bear the burden and pay the taxes should decide the question of incurring the liability. We need scarcely add, that there is a justice in this course which commends it to every one. We refer to the principal statutes: Laws 1864, p. 35, an act to enable certain counties to subscribe to the capital stock of two railroads, § 1. Laws 1864, p. 69, an act authorizing Wyandotte county to subscribe to the stock of the U. P. Railway Co., § 8. Laws 1865, p. 41, an act authorizing counties and cities to issue bonds to railroad companies, §§ 1, 3 and 4. Laws 1866, p. 72, an act amending last act, § 1. Laws 1867, p. 117, an act for incorporation of cities of second class, § 32. Laws 1868, p. 203, general incorporation act, § 51. Laws 1869, p. 108, amendment of last act, § 1. Laws 1870, p. 189, an act to enable townships to subscribe to the capital stock of railroad companies, § 5. Laws 1871, p. 134, an act con-

cerning cities of the third class, § 63. Laws 1872, p. 110, an act authorizing cities and townships to issue bonds for bridges, railroads, etc., §§ 3 and 9. Laws 1872, p. 210, an act concerning cities of second class, § 63. Laws 1874, p. 46, an act amending act of 1872, authorizing cities and townships to issue bonds for bridges, railroads, etc., § 10, Laws 1875, p. 68, an act authorizing the city of Marysville to issue bonds in aid of railroads, § 3. Laws 1875, p. 190, an act authorizing Marysville and other townships to issue bonds in aid of railroads, § 1. Laws 1876, p. 212, an act to enable counties, towns and cities to aid railroads, § 2. Laws 1876, p. 218, an act to enable counties, towns and cities to aid railroads, § 5. There are also several acts authorizing counties and cities to issue bonds in lieu of outstanding railroad aid bonds, or for funding or compromising existing railroad-aid indebtedness. Many even of these require a previous vote as a condition of the issue of the funding bonds, though in some cases the legislature seemed to think the vote authorizing the indebtedness originally was a sufficient assent of the people. As against this, it is doubtless fair to state, that there were some charters granted by the legislature of the territory to railroad companies which seem to embody authority to counties and cities to subscribe to the stock of the companies without any prior vote of the people. Laws 1855, p. 907, § 17; p. 912, § 14. And that in 1873 the legislature passed an act authorizing Toledo township, Chase county, to issue five thousand dollars of its bonds "for the purpose of building a side-track and depot on the line of the A. T. & Santa Fé railroad, * * * for the use and benefit of the people of said township;" (Laws 1873, p. 95, § 1;) and also an act authorizing cities of the first class to purchase or condemn sites for depots "to be held for the common use of all railroad companies now or hereafter connecting at such cities," and to issue their bonds therefor. These two acts are scarcely exceptions to the general course of legislation, as in each case it would seem that that for which the bonds were to be issued, was to be and remain the property of the muni-

cipality, and for the especial use of its citizens. And the private charters were granted long before railroad building commenced in this state, or the attention of the legislature was seriously called to the matter. So it may fairly be said, that the course of our legislation has uniformly been to require the assent of the people as a condition of the burden of railroad-aid bonds. It would seem therefore that before a law passed in the very midst of this legislation, and while the subject was uppermost in the thoughts of all, should be construed as conflicting with the constant rule, the intention to deviate therefrom should be manifest and clear. Again, while the legislature might, in view of the condition of affairs so forcibly and graphically pictured by counsel, wisely and justly so legislate as to guard the railroad companies against loss through any mere irregularities or omissions in the proceedings of the county officials, and to secure to them all that the majority of the voters had agreed to give them, it would seem equally wise and just that the people of every community should be protected from the imposition of burdens which they had actually refused to assume, and for which an apparent majority had been secured only by illegal and fraudulent votes. While any legislation may in particular instances work injustice, yet the spirit, the intent, the natural operation of every law should be to secure equal justice to all parties to be affected by it. And surely, it is justice to companies and people alike, if the former receive all that the latter agreed to give, and the latter are protected from all burdens which they have refused to assume. Any legislation which aims at that, and attempts to remove all technical obstructions thereto, aims at justice. Any which aims to the one side or the other, is unequal and partial.

But turning to the act itself, we think the true, the natural interpretation of its terms is in harmony with the course of our legislation, and the dictates of justice. The language is, "whenever a majority of the persons voting at any election * * * have heretofore voted." This defines and describes the cases to which the law may apply. Now, the term "per-

sons," standing by itself, is of course broad enough to sustain the construction claimed by counsel. It includes all, infants and adults, males and females, white and colored, citizens and aliens. But the word does not stand alone. The only persons referred to are "persons voting," and *voting* is a legal act. "Voting" is not the mere physical act of of depositing a piece of paper in a box. The physical act must be performed under certain conditions, and with certain concomitants, to render it voting. There must be an election held under some authority of law. The time and place must in some way be legally designated. Election-officers, acting under legal warrant, must be present to receive the votes, and decide as to the qualifications of voters. The question to be decided, or the offices to be filled, must be named by law. The person voting must possess certain qualifications of age, sex, citizenship, and residence, as provided by law. All these must exist, and attend the physical act of depositing the paper in the box, to make it voting—so that when the statute speaks of "persons voting," it describes those who are possessed of the legal qualifications to perform the physical act of depositing their ballots in the box under the circumstances and conditions prescribed by law. Only *electors* vote. Hence, when the statute names "persons voting," it means those electors who at the election named have exercised their right of voting. That the language used, strictly construed, implies this, will scarcely be questioned. But the claim is, that some who are not electors do actually vote; that their votes are counted; and that hence a statute speaking of " persons voting," means all whose votes are received and counted, whether electors or not. To this we reply, that it is a general rule of construction, that when the law speaks of an act done or to be done, it implies that it is *legally* done or to be done. When it speaks of an election, it means a *legal* election. When it speaks of a vote, it means a *legal* vote. When it names a class or body of persons, it implies that the persons *truly and rightfully* belong to that class or body. When it names electors, it means *legal* electors. When it speaks

of a legislature, it means a *legal* legislature. Again: While it is true that votes are counted as votes which are cast by persons not entitled to vote, it is not beause the law considers them rightfully there, but because through the imperfections of its machinery it has failed to eliminate the false from the true, and so is bound to assume all as true. Whenever it is able to detect the false, it rejects it. The election board is created in the first instance to judge of the qualification of those offering to vote, and to prevent those not qualified from exercising a right belonging only to those qualified. The law considers the action of the board as evidence that they whose ballots they received were legal voters, *prima facie* evidence only it is true, but still in the absence of other testimony conclusive. It therefore speaks of those persons as "voters," and the ballots they cast as "votes." But aware of the liability of this board to err, or be imposed upon, it provides a way of further inquiry; and if upon such further inquiry it appears that a ballot has been received from one not entitled to vote, it rejects that ballot, and no longer calls it a vote, nor the person casting it a voter. It treats it as though it had never existed. It is like a deed void upon its face, no deed at all. So that, when it speaks of a "majority of the persons voting," it means a majority of those rightfully voting. When it says that the person receiving a majority of the votes cast at an election shall be elected, it means a majority of the votes rightfully cast. The canvass may give one result, and if there be no contest that result determines what votes were rightfully cast. A contest may give another result, and this result is a more conclusive determination of the votes rightfully cast, and controls the result of the canvass. And yet the law, speaking of a majority of the votes cast, has reference all the while to those votes which the processes of the law determine are rightfully cast. It implies legality. It assumes truth. If it intends to class the legal with the illegal, to mix the false with the true, it will use language not merely broad enough to include both, but either necessarily including both, or plainly indicating the intention

to mingle both. But again, the latter portion of the section shows what was intended to be remedied by the act—what omissions and errors it sought to cure. If a majority voted in favor of the subscription, it might be made, whether the "orders and elections, or either of them, have been made in compliance with the statutes in such cases made and provided, or not, or whether the proposition submitted at the election had, was for the subscription of stock and the issuance of bonds to one or more railroad companies." So far as this last proviso is concerned, it refers to a matter upon which it was known there had heen conflicting decisions, and was intended to prevent controversy in the courts thereon. (See the discussion of this question, and the authorities cited, in *Lewis v. Bourbon Co.*, 12 Kas. 213.) It bears upon the question here, only as indicating what matters were in the thought of the legislature, and the character of the defects intended to be cured. The first proviso is alone material—though the "orders and elections were not made in compliance with the statutes in such case made and provided." The qualifications of electors were prescribed by the constitution, not the statutes. This is an act legalizing and validating elections. Did it intend to legalize votes which the constitution forbade? Was the scope and purpose of this language, to ignore the constitutional qualifications of electors, or simply to obviate any defects in the processes of the elections which the legislature had itself prescribed? Plainly, as it seems to us, the latter. It was intended to cure any irregularities in the proceedings, to make good any defects or omissions therein; and beyond that, left the original statutes authorizing these bond elections in full force; and by them the question of subscribing for stock and issuing bonds was to be determined by the qualified electors of the county, city or town. We had this act presented to us in the case of *Lewis v: Bourbon County*, 12 Kas. 186, and the views we now express are those we then held.

We pass now to the other question, the question of fact; and that is, whether a majority of the legal votes cast at said

4—17 KAS.

election were in favor of the subscription. And here we are confronted by an immense mass of testimony — some record evidence, the oral testimony of three witnesses, 2. Majority vote against issuing bonds. and the depositions of three hundred and eighty witnesses. We have patiently and carefully gone through with an examination of this testimony so far as it bears upon the election in Grasshopper Falls, and hastily looked through that concerning the election in Oskaloosa. Of course it will be impossible for us to refer to all this testimony in detail. We can only attempt to give some idea of its character, and then state the conclusions to which it has led us. A very full and accurate abstract and analysis was prepared by the counsel for defendant, and has materially lightened our labors in the examination of this volume of testimony. The result of the canvass as declared by the commissioners showed a vote of 862 in favor, and 766 against the subscription, or a majority of 96 in favor thereof. There is no testimony challenging the vote elsewhere than in the two townships of Grasshopper Falls and Oskaloosa. The return from the former township showed a vote of 447 in favor, and of 8 against the proposition. To this vote the bulk of the testimony has been directed. Three months prior to this election, and on October 1st 1867, a similar proposition had been submitted to the people of Jefferson county, and lost by a vote of 700 to 723. At that election the vote of that township had been 334 in favor and 12 against. At the intervening general election the vote on the various county officers had ranged from 278 to 285. On the 30th of September 1865, the vote on the question of issuing bonds to the plaintiff had been 180 for, and 8 against. The vote therefore as returned was 109 larger than at a similar election three months prior, and 170 above that of the regular county election two months prior, or a good deal more than half as large again. The two poll-books and returns were taken by one of the judges of the election and placed, one in his desk, he being the township trustee, and the other in the hands of the county clerk for the commissioners' canvass on the succeeding Friday. This

canvass was made early Friday morning, and apparently with only the friends of the measure present. A few moments thereafter opponents came in, and complaining of the early canvass, asked to see the poll-books of Grasshopper township, but the county clerk's copy had disappeared. A subpœna was sent to the township trustee to bring the copy he had retained, and it also had disappeared. And for seven years both copies were securely hid. In the absence of the poll-books, and without any list of the supposed voters at that election, the defendant proceeded to take testimony showing the different tracts of land and town lots within the township, and the names of all qualified voters on those respective tracts and lots in January 1868. Finally, by some means not disclosed, one of the poll-books was secured by the defendant, and has been identified and introduced in evidence before us. One hundred and ninety-four of the names on this poll-book are challenged by the defendant, and testimony is offered tending to show that they were not the names of legal voters. Twenty are shown by positive testimony to have been minors — nine of them by their own oaths, three by the testimony of their fathers, one by the testimony of his brother, and eight by the testimony of other relatives and acquaintances. Fifty-seven are by equally positive and direct testimony shown to have been non-residents of the township. Three by their own testimony were colored men, and not then legal voters. Twenty-two testify that they did not vote at all, though their names appear on the poll-books, some of them declaring that they were out of the state at the time of the election. Between seventy and eighty of the names on the list are declared by more than a score of the citizens (who testify that they are well acquainted with all the people of the township, and have resided there three years before and after this election,) to be entirely fictitious, and that no such persons ever lived in the township. While the return shows only *eight* votes against the proposition, *twenty-four* whose names are on the poll-books testify that they voted upon that day against it. Besides this, there is a volume of

testimony, and from many witness, showing in a general way, and without positively identifying persons and names, that boys, colored persons, and non-residents were voting, and that in many instances the same persons voted three or four times. Again, one of the judges testifies that he was out of the election room several times during the day, and that on his return he saw one of the other judges calling off names from a book, and the third depositing ballots in the box, while the clerks at the same time were recording names. On the other hand, we have the testimony of the two judges and the clerks denying this positively, and denying that illegal votes were received or recorded upon that day, and denying any fraud or illegality in the election proceedings. The value of their testimony is much impaired by the contradiction it receives from record as well as oral testimony. We quote the following criticism from the abstract and analysis furnished by the defendant, which is fairly supported by the record:

"Hillyer, Gunn, Gaines and Whitman testify that no colored man voted at that election except David Smith; and Hillyer, Gunn and Whitman positively and specifically testify that neither Ewin Hedspeth, Johnson May, nor Monroe Tompkins voted at that election; and all of them testify that no boys under 21 years of age voted at that election to their knowledge; and Hillyer testifies positively that neither E. B. Northrup, A. W. Robinson, Wm. Johnson, W. R. Hogan, Walter Furguson, John Marion, Wm. Gragg, jr., John Dodson, nor Wm. Dodson voted at that election. Gunn testifies that E. B. Northrup, A. W. Robinson, Wm. Johnson, A. Frazier, W. R. Hogan, Walter Furguson and John Marion did not vote to the best of his knowledge and recollection. Whitman testifies more positively that A. W. Robinson, E. B. Northrup, Wm. Johnson, Walter Furguson and John Marion did not vote. The names of all these persons so named by Hillyer, Gunn and Whitman are on the poll-book. Gunn, Hillyer and Whitman all testify positively that S. B. Hogan did not cast votes for or in the names of James Gordon, John Gordon and Wm. H. Mears; but the testimony of S. B. Hogan shows that he did cast these votes, and the names of the two Gordons and Wm. H. Mears are on the poll-book, and all three of them testify that they were not at the election and did not vote. Gunn, Hillyer and Whitman

also testify positively that Daniel Weiser did not vote but once, and did not vote in the name of Luther Grigsby; but we have proved by Weiser himself that he voted three times, and cast one of his votes in the name of Luther Grigsby. The name of Luther Grigsby is found on the poll-book in the handwriting of said Whitman. In his testimony Whitman stated, as a reason for his positiveness, that said Grigsby was a relative of his wife, and frequently at his house, and he knew that he did not write Grigsby's name upon the poll-book. We also prove by W. A. Cowan and R. K. McCartney that said Cowan and Robert Riddle and T. H. Elliott cast votes in the names of J. H. Cowan, James Elliott and Martin Elliott; and we prove by Zach. Gragg that said Whitman cast a vote in the name of John Gragg; and we prove by W. H. Coffman that Henry Marion with said Hillyer's knowledge and consent cast a vote for Henry Coffman, and that Henry Marion cast a vote in the name of George Cain. We also prove other repeating at that election, all of which is generally and the most of it specifically denied by plaintiff's witnesses; but the poll-book contains the names of the persons so voted for, and the persons are proven either to have been non-residents, or not to have voted at that election."

Other matters also appear in the record tending to weaken their testimony, which it is unnecessary to notice. There is also testimony tending to impeach in some degree the election at Oskaloosa, but into that we have not made a very careful examination, for from the matters to which we have alluded we are convinced that there were more than enough illegal votes polled at Grasshopper Falls to have changed the result. We know that allowance must be made for the imperfections of memory, and that some of those who say that they did not vote may in fact have voted as the poll-book indicates, and that some who testify that they voted against, may have forgotten, and really voted for the measure. But making allowance for all this, and still we must hold as we do. It does not seem probable that in a community no larger than this, seventy or eighty men could live and become qualified voters and still their very names be unknown to so many citizens, living so long, and by their business and habits so

familiar, with the community as are the witnesses in this case. The identification of so many individuals, and the proof of their want of qualification as voters, the general evidence of repeating, and illegal voting, the marked increase of the vote over that of the two immediately prior elections, all point to an illegal vote largely in excess of the majority disclosed by the canvass. It is with no feelings of pleasure that we have examined the testimony in this case, or reached the conclusions we have stated. No thoughtful man can read the story of an election conducted with such flagrant disregard of law and right, and be indifferent. More than one-fourth of the entire vote is shown to have been illegal and fraudulent, and this not in one of the crowded wards of a populous city, where we must expect outrages on the purity of the ballot-box, but in a quiet country community. The fact alone carries its own comments, and speaks its own shame.

One single remark more, and we are done. Counsel speaks of the fact that the plaintiff has built its road through Jefferson county, and honestly and fairly performed its part of the agreement, and that good faith requires of the county a like performance. It is a fact disclosed by the pleadings in this case, and indeed one of public knowledge, that the validity of this canvass was denied at the time, and that in a very few days proceedings were commenced in the United States circuit court to enjoin the commissioners from subscribing to the stock of the plaintiff and issuing its bonds therefor, and that such proceedings terminated in a perpetual injunction. (12 Kas. 127.) So that it cannot be said that the people waited quietly until the company had built its road, and then denied for the first time the validity of the canvass. They have contested it from the first, and the company has acted with full knowledge. While this fact does not bear upon the validity of the election, it does upon the good faith and conduct of the parties, and ought therefore to be stated.

The judgment will be entered for the defendant.

All the Justices concurring.